**TOY FAIR, INC., Harold P. Black and Robert J. Francis, Plaintiffs,**

v.

**George P. KIMMEL, individually and George P. Kimmel, Trustee for N. Richard Kimmel, Defendants.**

Civ. No. 11361.

United States District Court
D. Maryland.

Sept. 29, 1959.

Stanley B. Frosh, Silver Spring, Md., for plaintiffs.

Walter E. Black, Jr., John H. Somerville, and Hinkley & Singley, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

This action for an alleged wrongful eviction presents a maze of troublesome, novel problems, including: (A) whether under the facts defendant landlord was entitled (1) to re-enter the leased store on April 16, 1959, and change the lock, (2) to distrain for the May and June rent, and (3) to retain the air-conditioning equipment; and (B) what damages, if any, (1) the individual plaintiffs and (2) the corporate plaintiff are entitled to recover, in view of (a) what they did before April 16 and (b) what they failed to do thereafter. The fair result, how-

ever, is reasonably clear and will be reached by cutting through the maze.

Defendant George P. Kimmel, aged 75, a patent attorney, is trustee under a deed of trust which he created for the benefit of his son in 1935; it is agreed that all of his acts material to this case were done as such trustee and that the defendant trust estate is liable for any damages that may be awarded.

The individual plaintiffs, Black and Francis, were partners, trading as Toy Fair, until 1957, when they organized a corporation, Toy Fair, Inc., to take over their business, and transferred to it the stock and fixtures in the four stores which they had been operating in the Washington metropolitan area.

None of the parties was a trustworthy witness.[1]

In February, 1955, Kimmel leased to Black and Francis a store in the Rockville Shopping Center for a term of ten years, beginning March 1, 1955. The pertinent provisions of the lease are set forth in Note 2.[2] Black and Francis installed

---

1. Black and Kimmel were the principal witnesses for their respective sides. Francis merely adopted Black's testimony, inconsistent statements and all.

2. "2. * * * Excepting as herein otherwise provided, the Tenant shall open for business in the demised premises at or before the beginning of the term of this lease, and diligently conduct such business during the entire term hereof. * * *

"8(a) Landlord shall install a 5 ton air conditioning unit on the premises at a cost of Twenty-four Hundred Twenty Dollars ($2420.00) to be evidenced by a note signed by Tenant payable at the Farmers Banking and Trust Company, Rockville, Maryland, at the rate of One Hundred Dollars ($100.00) per month until paid. Tenant shall pay for the maintenance and operation of the air conditioning unit, which shall be and remain their property and be removable by them at the termination of this lease, but if tenancy is terminated prior thereto, the air conditioning unit shall remain as a permanent installation.

"12. Tenant agrees that they will operate the business to the end of the term hereof or of any renewal hereof as fully as they had been operated theretofore, and that upon removal of any fixtures, fountains or the like, they will restore the floor to usable condition, but as to any lighting fixtures that may be installed at Tenant's expense and that are attached to the premises, they shall remain with the vacated premises at no cost to Landlord, unless he specifically in writing demands their removal, in which event they shall be removed at the Tenant's expense. The air-conditioning unit, having been paid for by Tenant, shall be their property and may be removed at the end of the term, provided it is of a type that its removal will not damage the premises.

"19. All furniture, fixtures, equipment and stock of merchandise installed in or on the leased premises at Tenant's cost and expense shall belong to and be the property of the Tenant, and Tenant shall have the right to remove the aforesaid items from said leased premises at any time during or at the expiration of the term of this lease, provided that Tenant shall first have given Landlord not less than thirty (30) days notice in writing of their intention to make such removal and is not in default in the payment of any rent specified to be paid pursuant to this lease.

"22. It is further understood, covenanted and agreed by the parties hereto that if the Tenant shall fail to pay the rent herein reserved, or any installment thereof, when and as the same shall fall due and become payable, or fail to keep and perform any other covenant or agreement therein, on their part to be performed, then the term hereby created, or any renewal thereof, at the option of the Landlord, shall cease and determine and said non-payment of rent or breach of covenant shall operate as a notice to quit, all and every other kind of notice to quit hereby being expressly waived, and said Landlord or his assigns shall have the right to distrain for rent in arrears, or take such other action as Landlord may be advised, and said Landlord may re-enter upon the premises without process of law, and such re-entry by Landlord shall not operate to cancel this lease, but all liability herein imposed upon and assumed by Tenant shall remain and continue; and said Landlord shall have the right also to recover possession of said premises in such form of judicial proceeding as may then be available for such purpose.

"24. * * * Tenant may, if they so desire, operate the herein contemplated toy and sporting goods business in the demised premises through a separate cor-

show cases and other fixtures and built shelving against the walls. An air-conditioning system was installed, for which plaintiffs paid $2,400. Black and Francis conducted a toy business in the store until June, 1957, when their corporation, Toy Fair, Inc., took over the operation.

The lease called for a fixed rent and percentage rent payable in advance on the first day of each month, but by agreement of the parties $300 per month was paid and accepted as full fixed rental after January, 1956. The sales did not require any percentage rental. Until December, 1957, the rent was paid by the individuals, thereafter by the corporation; it was usually paid late, sometimes very late.

In December, 1958, Toy Fair, Inc., filed a petition in the United States District Court for the Eastern District of Virginia for an Arrangement under Chapter XI of the Bankruptcy Act, 11 U.S. C.A. § 701 et seq. Defendant was listed as a creditor for three months' back rent, which was eventually paid on April 23, 1959. The Debtor's Plan of Arrangement submitted in the Chapter XI proceeding rejected the Rockville lease and stated that the location had been found to be unprofitable. The Plan was approved on February 24, 1959. Meanwhile, on February 17, 1959, Black had written Kimmel as follows:

"* * * since we are not in a position financially to conduct business in Rockville herewith is our notice that we will close the Rockville store on March 31, 1959.

"We hope you will be able to rent these premises to a new tenant by that time or shortly thereafter. Of course, we will continue to be responsible for the rent each month. In the event we are able to interest another party in taking over the store we will bring this to your at-tention at once. In the meantime, as you so kindly suggested, this letter will serve as a notice to you of the store's availability as of April 1, 1959."

Kimmel replied on February 25, asking:

"1. When do you agree to have the stock of merchandise removed from the premises?

"2. When do you agree to have the fixtures removed from the premises?

"3. What are your intentions with respect to the air-conditioning unit now installed in the premises which you have paid for and which seems to be the only thing on the premises of any possible value as security under the lease?"

On February 26, Black and Francis replied:

"(1) * * * April 5.

"(2) Since we will be paying rent on the premises until a new tenant is found, we intend to leave the fixtures on the premises in the hope the new tenant may have use for them and we could reach some sale agreement with him.

"(3) Similarly, we will leave the air conditioning unit on the premises in the hope we can sell it to the new tenant."

Early in March plaintiffs began a "going out of business sale" at the Rockville store,[3] filling the windows with large signs to that effect, stating "Everything must go!", "All merchandise 50% off or more", "For Rent", "Fixtures for sale", and the like. One sign, changed each day, showed the number of days remaining in the sale, which would end early in April.

On March 24, 1959, Black and Francis wrote Kimmel proposing: (1) "to ter-

poration formed to operate said business, but it is specifically agreed and understood that Tenant shall not thereby be relieved of any of their obligations to Landlord under this lease and said other corporation shall additionally also assume and guarantee to Landlord full compliance with all the terms and conditions of this lease."

3. No similar sales were held at plaintiffs' other stores, except with respect to a line of clothing sold at the Shirlington store.

minate our lease" at the Toy Fair store, Rockville, on May 31, 1959, "or earlier should we surrender the premises before that time"; (2) to transfer to the landlord title to the air-conditioning machine, the awning and such additional fixtures "as are not removed by us prior to 5/31/59"; and (4) that "Rental payments for April and May 1959 shall not be required". The other proposals are not material, but plaintiffs added, "If you find a tenant who wishes occupancy prior to 5/31/59 we will be cooperative in effecting this."

Kimmel replied on March 28, rejecting the proposal and calling attention to paragraph 8(a) of the lease, which is set out in Note 2.

Plaintiffs had planned to conclude the "going out of business sale" on Saturday, April 11, and to remove the remaining stock to their other stores shortly thereafter. The sale, however, proved unexpectedly profitable; the March sales totaled $4,539 compared with $1,861 the previous March. Some time between Saturday, April 11, and Wednesday, April 15, plaintiffs decided to continue the sale until the end of April. Plaintiffs had bought very little new stock, not over $5,000 worth for all four stores since before Christmas; the sale presented an opportunity to get rid of old, slow-moving merchandise from all of the stores. Some distress merchandise had been purchased especially for the sale; other merchandise was marked up and then marked down.

Not having received the April rent by Friday, April 10, Kimmel telephoned the plaintiffs and was told by Black that the rent check was in the mail. When it was not delivered on the morning of April 11, Kimmel went to Rockville, arranged for the issuance of a distraint, and accompanied the deputy sheriff to the store, where the distraint was executed. Under instructions from Kimmel, the deputy sheriff seized only the racks, stands, cash register, adding machine and air-conditioner, since Kimmel had told plaintiffs' store manager that he did not wish to interfere with the sale of merchandise

then going on. The deputy sheriff, who also worked for Kimmel as a special policeman at the Shopping Center, valued the property seized at $500. The manager told Kimmel that they were closing up; that he was leaving that day, his wife the following Monday; and that plaintiffs "were going to move everything out" the following week.

The manager's wife continued the sale on Monday and Tuesday, and plaintiff Francis on Wednesday (April 15). Plaintiffs decided to close the store that afternoon, take inventory, and reopen Friday evening, April 17, for two weeks only. A sign to that effect was placed in the window, together with a smaller sign reading "For fixtures, call Ki. 8–1213." Plaintiffs made other efforts to sell the fixtures during the week of April 13.

Meanwhile, the check for the April rent had arrived on Tuesday, April 14, and had been deposited, but plaintiffs had not lifted the distraint on the fixtures by paying the costs. On Wednesday evening, April 15, Kimmel visited the store, saw the little sign "For fixtures, call Ki. 8–1213", but says he did not see the larger sign about reopening Friday night for two weeks. On Thursday morning, April 16, he met a locksmith at the store, which was closed, and had the locksmith change the lock. Before doing so, Kimmel called plaintiffs on the phone, was told that they planned to reopen Friday, but refused to believe them, and told them he was changing the lock. Kimmel's testimony as to why he changed the lock on that day is unsatisfactory; apparently he did it to prevent plaintiffs from removing the fixtures.

Black and Francis testified that they intended to continue operations at the Rockville store indefinitely. I find this testimony false. I find that they did intend to continue the sale for two weeks, until the end of April, and then move out. Plaintiffs did not ask Kimmel for a key, so that they could continue the sale or remove the merchandise. They took no steps of any kind to recover possession of the store, the fixtures, or the merchandise. They refused to accept the

merchandise when it was belatedly offered to them in June. They have done nothing except preserve and pad their action for damages for wrongful eviction.

Early in June Kimmel distrained for the May and June rent and had the sheriff seize everything in the store. The only items sold, however, were the cash register—$570, the adding machine—$30, a radio—$22.50, four wall cases—$100, a counter—$11, and two wall cabinets—$13, a total of $746.50. Of this amount, $600 was applied to the rent, $115.82 to costs and expenses, and the balance of $30.68, plus the $61.11 cash which had been found in the cash register, was tendered to plaintiffs in June, together with the stock of merchandise and the readily removable fixtures. Plaintiffs refused to accept any of the items, so they have been stored at plaintiffs' expense.

Kimmel re-rented the store, at a rental of $350 a month, beginning July 1. Despite the fact that the air-conditioner was listed among plaintiffs' property distrained upon, Kimmel claims that it is the property of the landlord under paragraph 8(a) of the lease (see Note 2), and the new tenant has repaired and is using it.

■ Defendant contends that he was entitled to re-enter the premises on April 16 and change the lock because plaintiffs had broken their covenant to "diligently conduct" the business during the entire term of the lease. See paragraph 2 (Note 2). Such a covenant is material, especially where the lease calls for a percentage rental. Am.Law of Property, vol. 1, sec. 3.41. Re-entry is a proper remedy for its breach. Ibid, sec. 3.94. It is not necessary that the landlord resort to legal process. Tiffany, Landlord and Tenant, vol. 2, p. 1404.

■ If defendant had re-entered after plaintiffs stopped doing business at the store, there would have been no doubt of the propriety of the re-entry. But since Kimmel had permitted plaintiffs to continue their sale beyond March 31 without objection, and had accepted the April rent after the correspondence set out above, he was estopped to re-enter before April 30. His re-entry on April 16 was illegal, and he was not entitled to distrain for or collect the May and June rent. If defendant had waited until April 30 to re-enter, he would have been entitled to keep the air-conditioner and the fixtures which were not readily removable. He would also have been entitled to collect $600 for the May and June rent, whether as damages or as rental need not be decided here. The lease was favorable to defendant, and he was entitled to his pound of flesh; but he also drew a drop of blood, and must suffer the consequences. It was a drop, however, and not a stream.

The store at Rockville had been unprofitable; plaintiffs intended to close the store on April 30, and to remove the remaining stock to the other stores. Moreover, the rights of the several plaintiffs to collect any damages from defendant are far from clear. The merchandise and the fixtures were owned by the corporate plaintiff, which had repudiated in the Chapter XI proceedings any contract it may have had with defendant, leaving the individuals as the only tenants. The individual plaintiffs were not conducting the business.

Plaintiffs' claims for damages fall into several groups:

■ 1. *Rent*—Since the re-entry on April 16 was unlawful, defendant is liable to return one-half ($150) the April rent, which he had accepted and deposited on April 14.

■■ 2. *Fixtures*—Plaintiffs wished to sell the fixtures, if possible, and intended to remove the cash register and other readily removable fixtures to the other stores if they could not be sold; except for the air-conditioner, however, the fixtures had little value apart from a going business in the Rockville store, and some of them were not worth the cost of removal. The air-conditioner had cost $2,400, had been used for three years and had depreciated in value. Considering

all of the evidence, I find it was worth about $1,600 in place and about $800 if removed from the premises.

The sheriff sold the most valuable readily removable fixtures for $746.50 gross, their full value. The other removable fixtures are of little value and have been available to plaintiffs for the asking. The shelving was worth nothing if removed, and was worth little in place to defendant or to a new tenant. Replacement value is not the proper measure of damage in this case, and if it were, the evidence thereof was not persuasive.

All things considered, an award to plaintiffs of $1,600 for the fixtures, including the air-conditioner, seems fair.

■ 3. *Merchandise and Loss of Profits*—Plaintiffs testified that the stock of merchandise on hand had no value to them in June, but was worth a great deal to them in April. I do not believe this testimony, and I find that there was little readily saleable merchandise in the store on April 16. Nevertheless, defendants could have sold some old, slow-moving merchandise during the last two weeks in April if they had been permitted to continue their "going out of business" sale at the Rockville location. The March sales had grossed over $4,000, and sales of nearly $2,000 might reasonably have been expected during the last two weeks of April. Of course, the corporate plaintiff would have been subjected to various expenses in making such sales, and the stock on hand would have been depleted. As it is, the merchandise on hand April 16 was at all times available to plaintiffs for the asking, and still is, subject to a small storage charge. The merchandise has depreciated little in value since April 16, but the corporate plaintiff has been damaged by loss of the opportunity to sell some of it during April in Rockville. I find that the stock on hand had a book value of $6,000, but was on April 16 and is now actually worth only $1,500. I further find that sales of $1,800 could have been made during the last two weeks in April at an expense of $600, with a reduction of $600 in the value of the stock on hand. The corporate plaintiff, therefore, has suffered a loss of $600.

■ 4. *Loss of Business Reputation and Credit*—The meagre testimony offered by plaintiffs on this point did not persuade me that plaintiffs suffered any such loss. I find no such loss.

■ 5. *Punitive Damages*—I find that Kimmel did not act with such malice as would entitle plaintiffs to punitive damages.

6. *Miscellaneous*—The corporate plaintiff is entitled to the $61.11 found in the cash register.

Cutting through the maze, I will enter judgment in favor of the individual plaintiffs for their own use and for the use of the corporate plaintiff in the amount of $2,411.11, each side to bear its own costs.