706 A.2d 124

NICHOLSON AIR SERVICES, INC.

v.

BOARD OF COUNTY COMMISSIONERS
OF ALLEGANY COUNTY.

No. 455, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Feb. 27, 1998.

48

52

Thomas X. Glancy, Jr., Baltimore (Greg Gesterling, Gaithersberg, on the brief), for appellant.

Stephen C. Wilkinson, Cumberland, for appellee.

Argued before HOLLANDER, EYLER and SONNER, JJ.

HOLLANDER, Judge.

This case requires us to consider several issues arising from two leasehold agreements for portions of the premises and facilities at a municipal airport. Nicholson Air Services, Inc. ("Nicholson Air"), appellant and lessee, challenges the judgments entered in the Circuit Court for Allegany County in favor of the Board of Commissioners of Allegany County (the "Board"), appellee and assignee of the leases in issue. On appeal, appellant presents four questions for our consideration, which we have reframed:

 I. Did the circuit court err when it granted summary judgment in favor of appellee as to appellant's claims for breach of its lease contracts and partial summary judgment as to appellant's claims alleging wrongful eviction and civil rights violations?

II. Did the court commit reversible error by declining to invoke its equity power to bar the forfeiture of appellant's leases with appellee?

III. Did the court err when it found that the Potomac Highlands Airport Authority, not appellee, evicted appellant from the leasehold premises?

IV. Was the court clearly erroneous in finding that appellee was not deprived of any rights that would entitle it to damages under 42 U.S.C. § 1983 and State law?

For the reasons that follow, we shall affirm.

## Factual Background

The material facts are undisputed.[1] On September 6, 1983, Nicholson Air and the City of Cumberland (the "City") entered a seven-year lease (the "Lease") by which appellant leased portions of the City's premises and facilities at the Cumberland Municipal Airport ("Airport"), located in Mineral County, West Virginia. The Lease covered: (1) the first floor of an administration building; (2) a maintenance hangar, constructed in 1970; (2) an older maintenance hangar; and (3) surrounding areas consisting of "runways, taxiways, parking areas, access and other roads as may be required for the operation of [the] Airport." The Lease provided that appellant would be the fixed base operator ("FBO") of the Airport, which involved, *inter alia,* selling fuel, providing aircraft maintenance, and renting out aircraft tie-down and hangar spaces. The termination date of the Lease was September 30, 1990, but it contained the following renewal clause:

> Upon written notice to be provided to Lessor not later than One Hundred Eighty (180) days prior to the expiration date hereof, Lessee shall have the option to renew this Lease for a further period of seven (7) years on the same terms and provisions hereof with the exception of the terms and provisions regarding rental.

---

1. Appellant asserts that many of the facts are disputed. We conclude, however, that to the extent there are any factual disputes, they are not material.

It is specifically agreed that Lessor and Lessee shall meet and confer on the amount of rental to be charged. Upon the failure of Lessor and Lessee to agree to a rental figure on or before ninety (90) days prior to the expiration of this Lease, any option to renew shall be void and Lessor shall have the right to lease the premises to any other party either by public competitive bid or private selection.[2]

Thus, appellant's written notice of renewal was due by April 3, 1990.

The Lease also obligated appellant to pay monthly rent of approximately $1000.00. Additionally, the Lease contained the following default provision:

That if the said Lessee, or its representatives or assigns, do or shall neglect or fail to perform and observe any of the covenants contained in this instrument, which on its or their part are to be performed ... then in said case the City or those having its estate in said premises lawfully, may immediately or at any time thereafter, without further notice or demand, enter into and upon the said premises or any part thereof in the name of the whole and repossess the same as of its former estate and expel the said Lessee and those claiming under it and remove its effects without being taken or deemed guilty of trespass, all and every claim for damages, for or by reason of said reentry, being hereby expressly waived, and without prejudice to any remedies which might otherwise be used for arrears of rent, and that upon reentry as aforesaid, the term shall cease and be ended, all cumulative of the statutory remedies of the Lessor.

On October 1, 1985, appellant and the City entered a second lease (the "Second Lease") involving additional property at the Airport, for the period from July 1, 1985 to June 30, 1990. The Second Lease covered an older administration building and provided for appellant to operate a flight school, dormitory facilities, and food service at the Airport. Although the

---

**2.** Appellee has not challenged the validity of the option. Given our conclusion that the option was not exercised, we need not decide whether the option was valid and enforceable.

Second Lease did not include a renewal provision, it had a default provision identical to that contained in the Lease.

On July 15, 1988, the Lease and the Second Lease (collectively, the "Leases") were assigned to Allegany County. The County also assumed operational control of the Airport.

In addition to serving as the FBO at the Airport, appellant operated a commuter airline called Cumberland Airlines. Although the airline operated out of the Airport, it was not subject to the Leases. In April 1989, Dale B. Nicholson, who was the president of Cumberland Airlines and the Vice-President of Nicholson Air Services, Inc.,[3] submitted a "Cumberland Airlines Business Plan" to the "Cumberland Airport Authority." The plan discussed possible expansion of commuter air service into Dulles International Airport. It also listed five requirements in order to provide service to Dulles, including the following:

4. EXTENSION OF PRESENT FBO LEASE HELD BY NICHOLSON AIR SERVICES, INC., FOR A PERIOD OF SEVEN YEARS WITH AN OPERATOR OPTION OF SEVEN ADDITIONAL YEARS. ANY ADDITIONAL REVENUES OR ROYALTIES PAID BY THE OPERATOR WOULD BE TIED INTO ECONOMIC GROWTH IN TERMS OF POPULATION AND EMPLOYMENT FIGURES. THIS MUST BE ACCOMPLISHED BY JULY, 1989.

No action was ever taken with regard to this proposal.

During the course of the two lease agreements, appellant had been late in making rental payments. In the fall of 1989, appellant's financial condition had deteriorated, and it was three months in arrears in its rental payments and in payment of electrical billings under the Leases. This prompted a letter from Jerry L. Frantz, Director of Finance for Allegany County, to Nicholson Air, dated December 14, 1989. The letter stated, in part:

---

3. Nicholson died in March 1990.

On numerous occasions, this office has sent you letters informing you of lease payments that are in arrears.

Once again, we are informing you that you have not paid Allegany County for October, November and December rent totaling $4,500. In addition, penalties and electrical billings, which total approximately $700, are unpaid.

Since this is in violation of your lease agreement, please make prompt payment to this office or legal action will be taken against you.

Nevertheless, appellant did not pay the rent or the electric bills. Consequently, on March 27, 1990, appellee sent a letter to appellant invoking its right to terminate the Leases and directing appellant to remove its personal property from the Airport.

On April 11, 1990, appellee filed a complaint in the Circuit Court for Mineral County, West Virginia, alleging a failure by appellant to pay rent and seeking a judgment of $12,444.33. On April 24, 1990, the Mineral County court ordered a pre-judgment attachment of all of appellant's personal property located at the Airport. On April 25, 1990, the day after the order was issued, C. William Armstrong, the Airport manager employed by appellee, wrote a letter, requesting appellant to depart and cease all business activity at the Airport. After the filing of appellee's complaint in West Virginia, but before the entry of the order of attachment, Stanley Shapiro purchased 80% of appellant's stock. On April 27, 1990, he appeared before the Board and offered to pay all of appellant's back rent, but the Board refused to accept payment. A week later, Shapiro again appeared before the Board, this time offering to pay appellant's back rent as well as the future rent due under both Leases through September 30, 1990. Again, the Board declined the offer.

On May 7, 1990, three days after having been rebuffed a second time by the Board, appellant tendered $12,769.33 to Nelson B. Michael ("Michael"), appellee's attorney who handled the attachment action in West Virginia. Michael accept-

ed the payment and gave appellant a handwritten receipt, stating:

> Received of Nicholson Air Service Inc. the sum of $12,769.33 in payment and satisfaction of the amount due and owing to the Board of County Commissioners of Allegany County, Maryland for accrued rent and court costs relating thereto.

> The parties stipulate and agree that upon payment of the amount of $12,769.33 that the pending action styled Board of County Commissioners of Allegany County, Maryland vs. Nicholson Air Service, Inc., Civil Action No. 90–C–108 shall be dismissed and the prejudgment order of attachment released.

Both Michael and appellant's auditor signed the receipt. On the same day, appellant sent notification to appellee of its intention to renew the Leases, even though the Second Lease did not contain a renewal option. Obviously, appellee's intention to renew was not exercised by the renewal deadline of April 3, 1990.

On May 11, 1990, four days after making payment to appellee's counsel, the West Virginia court released the attachment of appellant's assets. Nevertheless, between April 25, 1990 and August 17, 1990, appellee limited appellant's access to its assets at the Airport. Armstrong, the Airport manager, retained possession of the keys and controlled appellant's access to the hangar, fuel pumps, and its offices in the terminal building. There was no evidence, however, that Armstrong ever denied a request by appellant for access to these facilities. Moreover, appellant had difficulties with other creditors. For example, the evidence indicated that the "fuel farm" had been attached by Fidelity Bank as a result of a judgment dated April 5, 1990.

In June 1990, appellee executed an Intergovernmental Agreement with the State of Maryland, the State of West Virginia, the County Commission of Mineral County, West Virginia, and the Mayor and City Council of Cumberland, Maryland, establishing the Potomac Highlands Airport Au-

thority ("PHAA"), a bi-state authority created to operate the Airport. Each of the signatories to the Intergovernmental Agreement appointed members to the PHAA. One month later, the PHAA began to meet.

On August 17, 1990, a notice was posted on the Airport premises and distributed to appellant's employees, directing them to vacate the Airport. The notice was addressed to "All Officers, Directors, Employees and Agents of Nicholson Air Service, Inc. and KPT Aviation,[4] trading and doing business as Cumberland Airlines, or otherwise"; it was signed by Michael as the attorney and agent for the PHAA. The notice stated, in full:

> You, and each of you, are hereby notified to immediately remove yourselves from the premises known as the Cumberland Municipal Airport located at Wiley Ford, Mineral County, West Virginia, and to remain off of such premises unless you are specifically authorized or invited thereon by the Potomac Highlands Airport Authority. In the event that you fail to abide by this notice, you will be subject to prosecution for criminal trespass.

Armstrong, the Airport manager, was then being paid by appellee. He assisted Michael, the West Virginia attorney who had represented appellee in the Mineral County action, in posting and distributing the notice, with which appellant's employees complied. There was no evidence, however, that Michael was being paid by appellee on August 17, 1990.

In the meantime, on May 31, 1990, soon after appellant paid the back rent due under the Leases, appellant filed the suit at issue here, seeking a declaratory judgment establishing its contractual rights with appellee. Appellee timely answered appellant's complaint. There was no further activity in the case until January 10, 1992, however, when the clerk for the Circuit Court for Allegany County sent a notice to the parties, stating that the case would be dismissed for lack of prosecu-

---

4. KPT Aviation was a company that had been owned by Shapiro before he purchased Nicholson Air Services, Inc.

tion unless a written motion was filed within 30 days. No motion was filed, and the docket indicates that the case was dismissed on February 13, 1992. Nevertheless, appellant filed an amended complaint on January 26, 1993, which appellee timely answered. On March 17, 1993, the court (Sharer, J.) wrote a letter to both parties indicating that the case remained on active status. The court stated: "Although a notice of contemplated dismissal was filed in these proceedings, the matter did not proceed to actual dismissal."

A second amended complaint was filed on August 29, 1994. The five-count complaint sought a declaratory judgment establishing the rights and obligations of the parties to the Leases (Count I) and included claims for breach of contract (Count II), breach of implied covenant of good faith and fair dealing (Count III), wrongful eviction (Count IV), and deprivation of civil rights under 42 U.S.C. § 1983 (Count V). Appellee answered and sought summary judgment on all counts. Appellant filed a cross-motion for summary judgment. The court (Thayer, J.) conducted a hearing on the motions and, on April 14, 1995, granted summary judgment in favor of appellee as to the breach of contract and breach of implied covenant counts. The court also granted summary judgment in favor of appellee as to the wrongful eviction and § 1983 claims involving activities that occurred after September 30, 1990—the date on which the Lease was scheduled to expire. But the court concluded that "the default occasioned by non-payment of rent and the alleged conduct of the parties thereafter are not the subject of undisputed fact or inference and whether equitable intervention is appropriate must be ascertained at trial."

Consequently, a bench trial was held on the remaining counts, in which the court bifurcated the issue of damages. After the trial, the court entered judgment for appellee in all respects. As to the wrongful eviction count, the court concluded that appellant was wrongfully evicted because the notice to vacate stated that appellant's employees would be subject to criminal trespass if they did not leave the Airport. Nevertheless, the court found that the eviction was not caused by appellee, but instead was caused by the PHAA, which was

not a party to the case. As to the § 1983 count, the court concluded that, although appellee had attempted to restrict appellant's full use of the Airport before June 1990—when the Airport was placed under the authority of the PHAA—it was

undisputed that [appellant] continued to occupy the premises until eviction by PHAA on August 17. For a portion of that time [appellant's] equipment ... had been removed by attachment pursuant to the West Virginia litigation. How much, if any, of [appellant's] then faltering business was inhibited solely by defendant's attempts at restriction is not clear from the evidence before the Court. For these reasons, the Court finds that judgment for [appellee] and against [appellant] on [the § 1983 claim] is appropriate.

We will include additional facts in our discussion.

## Discussion

### I. *Summary Judgment*

Appellant's claims for breach of contract and breach of the covenant of good faith and fair dealing concern appellee's refusal to accept appellant's option to renew the Lease and appellee's refusal to renegotiate the Leases. Appellant argues that the trial court erred in granting summary judgment in favor of appellee because a genuine dispute of material fact existed regarding appellant's exercise of its option to renew the ʾLease. Specifically, appellant contends that it validly exercised the renewal option when it submitted the Cumberland Airlines Business Plan to appellee on April 26, 1989.

Maryland Rule 2–501 establishes a two-part test for summary judgment. "In deciding a motion for summary judgment ... the trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law." *Bagwell v. Peninsula Regional Medical Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996); *see also Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993); *Bits "N" Bytes Computer Supplies, Inc. v. Chesapeake & Potomac Tel. Co.*, 97 Md.App.

557, 580–81, 631 A.2d 485 (1993), *cert. denied,* 333 Md. 385, 635 A.2d 425 (1994); *Seaboard Sur. Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992).

On review, like the trial court, we must determine whether there are any genuine disputes of material fact. *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 206, 680 A.2d 1067 (1996); *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 144, 642 A.2d 219 (1994). A material fact is one that "will alter the outcome of the case depending upon how the factfinder resolves the dispute over it." *Bagwell,* 106 Md.App. at 489, 665 A.2d 297; *see also King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). In this regard, all factual disputes are resolved in favor of the non-moving party. More-over, all inferences reasonably drawn from the facts must be resolved in favor of the non-moving party. *Tennant v. Shoppers Food Warehouse Md. Corp.,* 115 Md.App. 381, 387, 693 A.2d 370 (1997); *see also Berkey v. Delia,* 287 Md. 302, 304–05, 413 A.2d 170 (1980); *Maloney v. Carling Nat'l Breweries, Inc.,* 52 Md.App. 556, 560–61, 451 A.2d 343 (1982).

To defeat the motion for summary judgment, the party opposing the motion must produce evidence demonstrating that the parties genuinely dispute a material fact. *Scroggins v. Dahne,* 335 Md. 688, 691, 645 A.2d 1160 (1994); *Fearnow v. Chesapeake & Potomac Tel. Co.,* 104 Md.App. 1, 49, 655 A.2d 1 (1995), *aff'd. in part and rev'd in part,* 342 Md. 363, 676 A.2d 65 (1996). "[M]ere general allegations which do not show facts in detail and with precision" are not sufficient to demon-strate a factual dispute that will defeat the motion. *Beatty,* 330 Md. at 738, 625 A.2d 1005.

If there are no disputes of material fact, the trial court resolves the case as a matter of law. *Fearnow,* 104 Md.App. at 48, 655 A.2d 1. We then review the trial court's decision to determine whether the court reached the correct legal result. *Beatty,* 330 Md. at 737, 625 A.2d 1005. Appellate courts generally review a grant of summary judgment based "only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *see also Gross v.*

*Sussex,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Hoffman v. United Iron and Metal Co.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

■ Because this case involves a lease contract, it requires an interpretation of the relevant terms. In the first instance, absent any ambiguity, this involves a question of law for the court to resolve. *See JBG/Twinbrook Metro Ltd. Partnership v. Wheeler,* 346 Md. 601, 625, 697 A.2d 898 (1997); *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997); *Shapiro v. Massengill,* 105 Md.App. 743, 754, 661 A.2d 202 *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995); *McIntyre v. Guild, Inc.,* 105 Md.App. 332, 355, 659 A.2d 398 (1995). When the language of the contract is ambiguous, however, the ambiguity must be resolved by the trier of fact. *Shapiro,* 105 Md.App. at 754–55, 661 A.2d 202.

■ The principal rule in the interpretation of contracts is to effect the intentions of the parties. *Kasten Constr. Co. v. Rod Enters., Inc.,* 268 Md. 318, 328, 301 A.2d 12 (1973); *McIntyre,* 105 Md.App. at 355, 659 A.2d 398; *Taylor v. Feissner,* 103 Md.App. 356, 373, 653 A.2d 947, *cert. denied,* 339 Md. 355, 663 A.2d 73 (1995). "The primary source for determining the intention of the parties is the language of the contract itself." *Scarlett Harbor,* 109 Md.App. at 291, 674 A.2d 106. When the language of the contract is clear, the court will presume that the parties intended what they expressed, even if the expression differs from the parties' intentions at the time they created the contract. *Roged, Inc. v. Paglee,* 280 Md. 248, 254, 372 A.2d 1059 (1977); *Scarlett Harbor,* 109 Md.App. at 291, 674 A.2d 106; *McIntyre,* 105 Md.App. at 355, 659 A.2d 398; *Shapiro,* 105 Md.App. at 754, 661 A.2d 202; *Bernstein v. Kapneck,* 46 Md.App. 231, 244, 417 A.2d 456 (1980), *aff'd,* 290 Md. 452, 430 A.2d 602 (1981).

■ In this case, the Lease's renewal clause provided that, in order to effectuate the option, appellant had to provide *"written notice . . .* to [appellee]" not later than 180 days prior

to expiration of the Lease. (Emphasis added). This provision is unambiguous, and appellant does not deny that notice of renewal had to be made in writing. Nevertheless, appellant contends that a genuine dispute of material fact exists as to whether a provision in the Cumberland Airlines Business Plan constituted notice to renew the Lease. The plan was a four-page document submitted to the "Cumberland Airport Authority" on April 26, 1989, approximately one year prior to the latest possible renewal date. As noted, it focused on potential expansion of service into Dulles International Airport by Cumberland Airlines. As part of the expansion proposal, the plan provided: "EXTENSION OF PRESENT FBO LEASE HELD BY NICHOLSON AIR SERVICES, INC., FOR A PERIOD OF SEVEN YEARS WITH AN OPERATOR OPTION OF SEVEN ADDITIONAL YEARS." It is this clause that appellant asserts constituted notice to renew its Lease.

The trial court rejected appellant's contention, stating:

> This language was simply not a written notice of plaintiff's intention to renew the primary lease for a term of seven years, but is merely one of five conditions proposed as necessary to accomplish improved and additional air service. It does not even lend itself inferentially to an exercise of the right of renewal without an impermissible flight of fancy.

We completely agree with the trial court.

Appellant cites *Katz v. Pratt Street Realty, Co.*, 257 Md. 103, 262 A.2d 540 (1970), for the proposition that "[a] proper notice of acceptance is not made inoperative by the fact that it is accompanied by a proposal for some other substitute arrangement subject to the other party's consent." *Id.* at 118, 262 A.2d 540 (quoting 1A *Corbin on Contracts* § 264 (1963)). Appellant ignores the preceding sentence in that case, however: "It is well settled that to be valid, the exercise of an option *must be unequivocal and in accordance with the terms of the option.*" *Id.* (emphasis added). The cited provision in the Cumberland Airlines Business Plan is not the least bit unequivocal. Moreover, it was submitted by the air carrier

component of appellant's business, which, as appellant insists elsewhere in its brief, was not covered by either lease.

Further, appellant relies on *Reis v. Sparks*, 402 F.Supp. 1393 (D.Md.1975), *aff'd*, 547 F.2d 236 (4th Cir.1976), for the proposition that the court should have looked at extrinsic evidence to consider the parties' intent. Specifically, appellant points to the affidavits of two of its officers who stated that, almost one year after the Cumberland Airlines Business Plan was submitted, they had *orally* informed appellee of the company's intention to exercise the Lease renewal option. Appellant's reliance on *Reis* is misplaced. There, the court held that a letter from the appellee was sufficient to exercise an option to purchase appellant's land. The letter, sent directly from appellee to appellant, included the following sentence: "Pursuant to the contract of sale agreement entered into between yourselves as sellers and my wife and me as buyers of your farm property located in Frederick County . . ., please be advised that it is our intention to exercise the option, included as part of said contract, to purchase the balance of the land . . . ." *Id.* at 1398. The court concluded that use of "an element of the future tense does not preclude an interpretation of an immediately operative acceptance." *Id.* (quotation omitted).

In contrast, as we have indicated, the language of the Cumberland Airlines Business Plan was not an unequivocal acceptance, nor did it express an intention to renew the Lease between Nicholson Air and appellee. Moreover, because the contract required a written renewal, any oral statements of appellant's employees were ineffective and thus did not create any genuine issues of material fact.

Appellant also argues that its failure to tender renewal was excused because appellee repudiated the Lease. Appellant cites no case law for this argument; instead it relies on 77 Am.Jur.2d § 54 (1997). We read that section of the treatise to stand for the proposition that tender may be excused in some instances when the optioner repudiates the contract, but the optionee must nonetheless indicate a definite acceptance and

willingness to proceed with the contemplated transaction. Even if we were to adopt this proposition, there is no evidence here to indicate that appellant, as optionee, conveyed a definite acceptance and willingness to proceed with the Lease renewal until after the period for doing so had expired.

Therefore, we hold that the trial court correctly concluded that there was no genuine dispute of material fact and that appellant did not timely effectuate a renewal of the Lease in accordance with the parties' agreement. Thus, we shall affirm the entry of summary judgment with regard to counts II and III. Moreover, because the Lease was not renewed, and thus not extended beyond the express expiration date of September 30, 1990, the court correctly granted partial summary judgment in favor of appellee as to counts IV and V for any events occurring after September 30, 1990.

## II. *Trial*

■ The remaining issues arise from the bench trial. Rule 8–131(c) establishes our standard of review:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

*See In re Joshua David C.,* 116 Md.App. 580, 592, 698 A.2d 1155 (1997) ("Indeed, we accept the facts as found by the hearing judge, unless clearly erroneous."); *State v. Johnson,* 108 Md.App. 54, 70–71, 670 A.2d 1012 (1996). If the trial court's findings are supported by substantial evidence, the findings are not clearly erroneous. *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834 (1975); *Sea Watch Stores Ltd. Liab. Co. v. Council of Unit Owners,* 115 Md.App. 5, 31, 691 A.2d 750, *cert. dismissed,* 347 Md. 622, 702 A.2d 260 (1997). "Therefore, if 'competent material evidence' supports the trial court's findings, we must uphold them and cannot set them

aside as 'clearly erroneous.'" *Johnson,* 108 Md.App. at 71, 670 A.2d 1012.

 It is not our function to substitute our judgment for that of the fact finder, even if we might have reached a different result. Instead, we must "decide only whether there was sufficient evidence to support the trial court's findings. In making this decision, we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusions of the lower court." *Mercedes–Benz v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993); *see also Johnson,* 108 Md.App. at 71, 670 A.2d 1012. We review the lower court's application of law to the facts based on an abuse of discretion standard. *Pierce v. Montgomery County,* 116 Md.App. 522, 529, 698 A.2d 1127 (1997).

a. *Waiver of Forfeiture and Denial of Equitable Relief*

There is no dispute that appellant breached its Leases by failure to pay rent. Nor is there any dispute that appellee sent notice to appellant terminating the Leases as a result of appellant's breach. Instead, we consider whether appellee waived forfeiture of the Leases or if equity should intervene to prevent forfeiture. In its brief, appellant appears to conflate waiver of forfeiture with denial of equitable intervention. Nevertheless, we will consider the issues individually, as the resolution of the waiver issue is important to our discussion of equitable intervention. *See, e.g., Rose and Crown, Ltd. v. Shaw Enters., Inc.,* 28 Md.App. 548, 346 A.2d 459 (1975) (considering waiver and equitable relief separately).

i. *Waiver*

 "Waiver is the intentional relinquishment of a known right or such conduct as warrants an inference of the relinquishment of such a right." *Chertkof v. Southland Corp.,* 280 Md. 1, 5, 371 A.2d 124 (1977); *see also Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 531, 200 A.2d 166 (1964); *Gould v. Transamerican Assocs.,* 224 Md. 285, 294, 167 A.2d 905 (1961). The "universal" rule in Maryland is that "waiver

of forfeiture may occur by an acceptance of rent which accrues after the lessor is on notice that a breach has been committed by the lessee." *Chertkof,* 280 Md. at 6, 371 A.2d 124. The issue is one of intent, which turns on the factual circumstances of the case. *Id.*

■■■ Appellant contends that the combination of the following actions waived forfeiture of the lease:

1. Appellee accepted $12,769.33 in arrears on May 7, 1990.
2. Appellee failed to object to the renewal letter of May 7, 1990.
3. Appellee provided limited access to the airport between March 27, 1990 and August 17, 1990.
4. Appellee failed to take any possessory action in court.

According to appellant, the facts in *Chertkof* are so similar to those in this case that it should "control the outcome." The facts of the cases, however, are easily distinguishable. In *Chertkof,* notwithstanding a covenant in the lease barring assignment of the premises without the lessor's written consent, the lessee assigned the lease without the lessor's written approval. When the lessor learned of the assignment, the lessor wrote a letter to its lessee canceling the lease and declaring it null and void. The letter also stated that the acceptance of checks from the subtenants as payment of rent would not be construed as an approval of the assignment. Thereafter, the lessor accepted rental payments from the subtenants for over two years. The lessor and assignee also unsuccessfully engaged in negotiations for a new lease. Subsequently, the lessor sued the lessee for ejectment and damages. The trial court found that the lessee had breached, but concluded that the lessor waived the breach by its subsequent acceptance of accrued rent from the assignee after learning of the breach, notwithstanding the lessor's reservation to the contrary in the letter to its lessee.

The Court of Appeals affirmed the trial court, concluding that its findings were not clearly erroneous. The Court emphasized, however, that the trial court's finding of waiver

was based not only on the lessor's acceptance of the subsequently accrued rent from the assignee, but also on the lessor's negotiations for a new lease with the subtenant, which continued over a period of months before the lessor sued for ejectment and damages. "From all this, the [trial] court found that the true intention of the lessor, rather than to enforce the lease, was to negotiate a more lucrative lease." *Chertkof,* 280 Md. at 9, 371 A.2d 124.

In the case *sub judice,* appellee sued for past rent due and for rent for April 1990, when Nicholson Air remained at the Airport after appellee had terminated the Lease. The court found that appellee's subsequent acceptance on May 7, 1990, of $12,769.33 in rent "effect[ed] a release of [appellant's] airplanes[5] and equipment in May. No payment of rent was thereafter made or even tendered although [appellant] continued to occupy the premises until the final notice to quit was delivered August 17." The court's finding was supported by substantial evidence, including, *inter alia:* (1) evidence that the Board had refused to accept appellant's tender of payment for future rent; (2) the receipt from appellee's counsel stating that the payment was "in payment and satisfaction of the amount due and owing" to appellee; (3) additional language in the receipt that "upon payment of the amount of $12,769.33 that the pending action [for attachment] shall be dismissed and the prejudgment order of attachment released"; and (4) evidence that appellant tendered no other payments to appellee, even though appellant continued to occupy the Airport.

---

**5.** Appellant asserts that the attachment of its property did not include its airplanes and that there was no evidence that its planes were attached. Thus, appellant argues that the court's finding was erroneous. Even if this particular finding was erroneous, it is undisputed that other property that belonged to appellant was attached. Therefore, if the trial court's finding with regard to the airplanes was erroneous, we conclude that it was harmless. *See Department of Economic & Employment Dev. v. Propper,* 108 Md.App. 595, 606–07, 673 A.2d 713 (1996) (concluding that agency's mischaracterization of two conversations as "numerous" was harmless, because it was not the basis of the agency's action).

The factual circumstances of the case *sub judice* and *Chertkof* are strikingly different. There, when the lessor accepted rental payments for more than two years after stating that it was terminating the lease, the court determined that the lessor's "true intention" was to renegotiate a new lease. Unlike in *Chertkof,* the facts of this case demonstrate appellee's unwavering intention *not* to forgive appellant's failure to pay rent. It is undisputed that, on two occasions, appellee refused to accept appellant's tender of rent. It was only after these two unequivocal rejections that appellant traveled to West Virginia, where appellee's counsel accepted a check for $12,-769.33 in payment for accrued rent and court costs relating to the suit appellee filed in Mineral County. Moreover, appellant concedes, as it must, that this payment did not include any future rent. Nor was there any evidence that appellee engaged in negotiations with appellant for a new lease. Therefore, we conclude that the trial court was not clearly erroneous in finding that appellee did not waive forfeiture.

### ii. *Equitable Relief from Forfeiture*

Equitable relief from forfeiture is a cousin of the legal doctrine of waiver. It is "an offshoot of the disfavor with which the courts will view a forfeiture." *Rose and Crown,* 28 Md.App. at 557, 346 A.2d 459. As the Court observed in that case,

"Courts of equity are only closed against the tenant where the forfeiture is incurred by his wilful and culpable neglect to fulfill the terms of his covenant and not in cases where the omission has been occasioned by an inevitable accident. And the general rule to be applied to all such cases seems to be that Courts of equity will relieve where the omission and subsequent forfeiture are the result of mistake or accident and the injury and inconvenience arising from it are capable of compensation; but where the transaction is wilful, or the compensation impracticable, they invariably refuse to interfere."

*Id.* at 558, 346 A.2d 459 (quoting *Wylie v. Kirby*, 115 Md. 282, 287, 80 A. 962 (1911)) (emphasis and internal quotation omitted).

 Appellant argues that *Evergreen Amusement Corp. v. Pacheo*, 218 Md. 230, 233, 145 A.2d 774 (1958), dictates that equity should relieve its forfeiture. In that case, the issue on appeal was whether equity should have granted relief from forfeiture of a lease, because the tenant had tendered all of the past-due rent. The Court upheld the trial court's decision that the lease had been forfeited. The Court observed that, because the tenant was insolvent, the landlord was entitled to possession of the property because there was a likelihood that the tenant could not meet future rent obligations. *Id.* at 235, 145 A.2d 774. In this case, however, appellant argues that its offer to pay the past rent and all future rent in advance eliminated any possible harm to appellee. Thus, appellant asserts, equity should prevent forfeiture. We disagree.

 The decision whether to invoke a court's equity powers to grant relief from forfeiture is within the discretion of the trial court. *See Maxima Corp. v. Cystic Fibrosis Found.*, 81 Md.App. 602, 620, 568 A.2d 1170, *cert. denied*, 319 Md. 582, 573 A.2d 1337 (1990). In the case *sub judice*, appellant's refusal to tender rent until after appellee filed the attachment action in West Virginia supports the trial court's conclusion to deny equitable relief. *See Dreisonstok v. Dworman Bldg. Corp.*, 264 Md. 50, 61, 284 A.2d 400 (1971) (holding equitable relief should have been denied when lessee continually refused to pay taxes on leased property).

The Lease in this case involved the operation of a public airport. Consequently, appellee's interest involved far more than collection of rental fees. Indeed, the evidence was undisputed that appellant was in serious financial difficulty and had dramatically reduced its operations at the Airport because of these problems. Many of appellant's assets had been attached by creditors. Admittedly, after purchasing appellant's stock for one dollar, Shapiro insisted that he intended to restore operations at the Airport. Nevertheless,

in light of all of appellant's financial problems, we do not believe that appellee was required to continue doing business with appellant as the fixed based operator at the Airport merely because appellant had tendered rent. As we have already found that the trial court's findings on the issue of waiver were not clearly erroneous, we also conclude that the court did not abuse its discretion in refusing to grant equitable relief.

b. *Wrongful Eviction*

Appellant also alleged that it was wrongfully evicted from the Airport as a result of appellee's actions on August 17, 1990, when it posted the notice to vacate and distributed the notice to appellant's employees. On appeal, appellant argues that the trial court committed reversible error by finding that appellant's eviction from the Airport on August 17, 1990, was not actionable because it was the action of the PHAA rather than appellee. The court based this finding on evidence that the notice to vacate was in the name of the PHAA, and the notice was delivered to appellant's employees by the attorney for the PHAA. Appellant asserts that the court's finding was clearly erroneous, however, because at the time of eviction the PHAA did not have "independent authority to evict under the lease." In this regard, appellant points to the terms of the intergovernmental agreement creating the PHAA which contained three unsatisfied prerequisites to the PHAA's authority over the Airport or the Lease. These were: (1) assignment from appellee to the PHAA of the lease for the entire Airport, giving control of the Airport to the PHAA; (2) the exchange of documents between the governors of Maryland and West Virginia setting forth the financial contributions of the states and their local governments to the PHAA; and (3) approval by the Federal Aviation Administration.

It is undisputed that the first prerequisite was not completed until December 1990, and appellant asserts that appellee failed to demonstrate that the other two were ever satisfied. Therefore, Nicholson Air insists that the PHAA lacked legal authority to act on August 17, 1990. Further, because there

was no evidence that the PHAA could act independent of appellee, it contends that appellee was responsible for the wrongful eviction.

 For its part, appellee argues that, even if the PHAA had acted as appellee's agent, the acts did not constitute a wrongful eviction. At the outset, appellant responds that we may not consider appellee's argument that the eviction was not wrongful, because it was not raised by way of a cross-appeal. Appellant's argument is without merit. Having prevailed at the trial level, appellee is permitted to raise this issue without having to file a cross-appeal. *Paolino v. McCormick & Co.*, 314 Md. 575, 579, 552 A.2d 868 (1989)("[I]f the losing party appeals, the winning party may argue as a ground for affirmance matters resolved against it at trial."). In *Offutt v. Montgomery County Bd. of Educ.*, 285 Md. 557, 404 A.2d 281 (1979), Judge Eldridge explained this principle:

> Where a party has an issue resolved adversely in the trial court, but ... receives a wholly favorable judgment on another ground, that party may, as an appellee and without taking a cross-appeal, argue as a ground for affirmance the matter that was resolved against it at trial. This is merely an aspect of the principle that an appellate court may affirm a trial court's decision on any ground adequately shown by the record.

*Id.* at 564 n. 4, 404 A.2d 281 (citations omitted).

Accordingly, we must consider whether appellee's act in posting its notice to quit constituted an eviction and, if so, whether it was wrongful. If we determine that appellee's acts constituted a wrongful eviction, we will then consider whether the trial court erred in concluding that the eviction was not caused by appellee.

Appellant argues that the eviction was wrongful because appellee did not resort to the summary ejectment procedure set forth in Md.Code (1974, 1996 Repl.Vol.), § 8-401 of the

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Real Property Article ("R.P.").[6] The pertinent provision states:

> Whenever any landlord shall desire to repossess any premises to which he is entitled [for failure to pay rent], he or his duly qualified agent or attorney *shall make his written complaint under oath or affirmation, before the District Court* of the county wherein the property is situated....

*Id.* § 8–401(b) (emphasis added).

Appellee argues that it did not violate R.P. § 8–401 because its notice to vacate did not constitute a constructive eviction. Appellee also asserts that Nicholson Air was not wrongfully evicted because it voluntarily vacated the premises after being served with a notice to quit. In finding that the notice to quit constituted a wrongful eviction, the trial court stated: "It would appear that Nicholson's removal from the premises after August 17 was in response to a threat of criminal prosecution, an action which hardly bespeaks voluntariness...."

▮▮▮▮▮▮ " 'A constructive eviction occurs when the acts of a landlord cause serious or substantial interference with the tenants' enjoyment of the property which results in the tenant vacating the premises.' " *Stevan v. Brown,* 54 Md.App. 235, 240, 458 A.2d 466 (1983) (quoting A. Rhynhart, *Notes on the Law of Landlord and Tenant,* 20 Md. L.Rev. 1, 23–24 (1960)); *see also Bocchini v. Gorn Management Co.,* 69 Md.App. 1, 12 n. 7, 515 A.2d 1179 (1986). The landlord's acts must be done "with the intent and effect of depriving the tenant of the latter's use and enjoyment." *Stevan,* 54 Md.App. at 240, 458 A.2d 466; *see also McNally v. Moser,* 210 Md. 127, 140, 122 A.2d 555 (1956). Intent may be inferred from the nature and impact of the acts. *Stevan,* 54 Md.App. at 240, 458 A.2d 466; *Q C Corp. v. Maryland Port Admin.,* 68 Md.App. 181, 199, 510

---

**6.** Although the property in this case is located in West Virginia, neither party has asserted that foreign law applies, and therefore we shall assume that Maryland law applies. *See Chambco v. Urban Masonry Corp.,* 338 Md. 417, 421, 659 A.2d 297 (1995).

A.2d 1101 (1986), *aff'd. in relevant part and rev'd in part,* 310 Md. 379, 529 A.2d 829 (1987).

 Although constructive eviction is commonly raised as a defense in an action for rent, it may also "provide a litigant with a sword." *Stevan,* 54 Md.App. at 242, 458 A.2d 466. In such cases, the tenant may sue for damages to recover whatever loss the tenant has sustained as a result of the landlord's acts. *Id.* at 243, 458 A.2d 466. Such acts or omissions that might constitute constructive eviction include: "failures to furnish heat, elevator service, and necessary electricity"; failure to furnish sanitary restroom facilities; and frequent flooding of the premises because of the landlord's fault. *See id.* at 240, 458 A.2d 466. In *Stevan,* for example, the tenant sued for damages related to the loss of a renewal term that was caused by the landlord's failure to furnish adequate sanitary services. Similarly, in *Q C Corp.,* the tenant sued the landlord for, *inter alia,* constructive eviction and damages related to the loss of a renewal term because the landlord had permitted its tenant on the adjacent property to dispose of hazardous materials next to property leased to the plaintiff tenant. 68 Md.App. at 185, 199–200, 510 A.2d 1101. In neither of these cases, however, was the tenant in breach of the lease when it filed suit against the landlord.

 Although we have found no Maryland cases directly on point, we are persuaded by the authorities that have adopted the view that a mere notice to quit does not amount to constructive eviction. For example, in *Quitta v. Fossati,* 808 S.W.2d 636 (Tex.Ct.App.1991), *writ denied* (Nov. 13, 1991), the tenant left the premises without protest after the landlord told the tenant that if the tenant did not pay the rent in cash, the landlord wanted the tenant to leave or he would "get the sheriff to get [them] out." *Id.* at 643 (alteration in original). The court stated:

[A] mere notice to quit, followed by vacation of the premises by the tenant, does not constitute a constructive eviction, for there must be some additional feature, such as harassing incidents disturbing to the tenant's peaceful possession and

occurring on the property; and, that if the tenant moves without protest, there is no eviction.

*Id.*

Similarly, in *Cavalier Square Limited Partnership v. Virginia Alcoholic Beverage Control Board,* 246 Va. 227, 435 S.E.2d 392 (1983), the lessor wrote a letter to its lessee advising that the lessee's assignment of the lease constituted a breach. The lessor wrote: "If necessary, [the lessor] is prepared to institute legal proceedings to prevent further unauthorized activities on the ... premises leased to [the lessee] and to recover any damages incurred by [the lessor] as a result of such activities." *Id.* 435 S.E.2d at 394. The court held that "a threat by a lessor to resort to legal process, when made in good faith, is not such intentional conduct that would support a finding of constructive eviction." *Id.* at 395.

 In this case, there was no evidence that either Michael or Armstrong threatened violence against appellant's employees when they delivered and posted the notice to quit at the Airport on August 17, 1990. Nor was there evidence that appellant's employees or appellant even protested. Moreover, Armstrong gave appellant's employees one week to vacate the Airport premises, and the uncontradicted evidence indicated that appellant's employees left peacefully.

Admittedly, appellant complained that Armstrong continually limited its access to the terminal building, maintenance hangar, and fuel pumps after Armstrong delivered an earlier notice to quit in April 1990. Although Armstrong had changed the locks on the office building, and placed a chain and lock on the fuel pumps, he testified that appellant's employees had full access to the building during working hours and that he only secured the building "at the end of the day when everybody was gone." He also stated that he was unsure whether the maintenance hangar was locked at all, but added that access to the hangar was "very easy" because it had a cloth door and anyone could have entered through the side of the door. Moreover, although Shapiro, Nicholson's President, testified that his employees had to request permis-

sion from Armstrong to allow access to the hangar and the fuel pumps, he did not state that Armstrong ever denied any request for access. Notwithstanding appellee's conduct prior to issuance of the notice to quit, appellant remained at the Airport.

It is noteworthy that appellant did not assert that the conduct of appellee amounted to constructive eviction when appellant initiated its suit on May 31, 1990. At that time, it only sought to determine its rights under the Leases; it did not include any claims for wrongful or constructive eviction until it filed its second amended complaint in August 1994. Only then did it assert that the acts of August 1990 constituted wrongful eviction on the ground that appellee did not resort to judicial process. Moreover, it is undisputed that Nicholson Air was in serious financial trouble during this period. Appellant reduced the size of its workforce at the Airport through lay offs, and for a portion of this time had no aircraft maintenance workers. Additionally, the fuel farm and several of appellant's planes had been attached by other creditors. Therefore, we conclude that neither appellee's conduct nor its issuance of the notice to quit on August 17, 1990, constituted constructive eviction.

Even if the restricted access and the threat of criminal prosecution transformed the notice to quit into a constructive eviction, we do not believe the eviction was wrongful. As we noted, appellant argues that the notice was "wrongful" because appellee did not resort to the summary ejectment procedure in R.P. § 8–401 and instead resorted to "self-help."

First, we consider whether resort to the statutory remedy is mandatory. Prosser and Keeton have explained:

In virtually all jurisdictions, a summary procedure exists by which the owner may recover possession by legal process, after only a brief delay. Few things are more likely to lead to a brawl than a landlord evicting his tenant by main force. Land cannot be sequestered or removed, and the public interest in preserving the peace would seem to justify the temporary inconvenience to the owner.

W. Page Keeton et al., *Prosser and Keeton on Torts* § 23, at 144–45 (5th ed.1984).

■■■ To be sure, resort to the statutory summary ejectment procedure is the preferred mechanism for repossessing property that is wrongfully held by a tenant. But it is not the exclusive remedy in Maryland. *K & K Management, Inc. v. Lee*, 316 Md. 137, 557 A.2d 965 (1989), which neither party cited, is instructive.

There, the owners of a motel entered into a profit sharing lease with the appellees to operate the motel's restaurant. Approximately two years into the lease, the owners decided it would be more efficient to terminate the lease than to continue it. Accordingly, the owners locked out the appellees, without notice and in breach of the lease. Appellees sued, *inter alia*, for breach of contract, conversion, and tortious interference with business relationships. In discussing the level of wilful behavior required to constitute the tort of interference with business relations, the Court recognized that, in the commercial context, a lessor may re-enter and resume possession of the leased premises, so long as it is not accomplished by force. *Id.* at 167, 557 A.2d 965. The Court explained:

> Here appellants retook possession of the restaurant premises by changing the locks without notice. But K & K owns the premises. The [appellees'] rights either to occupy the premises or to receive notice of termination rested on the Agreement. *Appellants' action was unlawful exclusively in the sense that it was a breach of contract.*

*Id.* at 167–68, 557 A.2d 965 (emphasis added) (footnote omitted).

The Court was also clear when it stated:

> We do not encourage resort to self-help and . . . the Bar usually counsels against it. *Nevertheless, self-help is not a prohibited means of acquiring repossession of premises upon termination of a commercial lease, so long as the repossession can be effected peacefully.*

*Id.* at 178, 557 A.2d 965 (emphasis added) (citing Maryland Institute for Continuing Professional Education of Lawyers,

Inc., *Commercial Leases*, 257, 259 (1987)); *see also Toy Fair, Inc. v. Kimmel*, 177 F.Supp. 129, 134 (D.Md.1959) ("Re-entry is a proper remedy . . . for breach [of a commercial lease].") *Cf. Postelle v. McWhite*, 115 Md.App. 721, 735, 694 A.2d 529 (1997) (observing that self-help was not proper procedure for collecting rent owed while lease was still in effect, contrasted with *K & K Management*, which involved self-help to recover possession). Although *K & K Management* involved actual malice in the context of interference with business relations, the reasoning is equally applicable to this case.

Appellant relies on *Quigley v. Simon*, 24 Md.App. 493, 496–97, 332 A.2d 270 (1975), for the proposition that self-help is never permitted to repossess a leased property. Instead, appellant asserts that *Quigley* mandates that a landlord resort to the summary ejectment procedures prescribed in the Real Property Article. Appellant's reliance on *Quigley* is misplaced. The Court there held that the statutory procedures of R.P. §§ 8–303 to 8–308 regarding distress for rent must be followed, thereby barring the availability of the common law remedy of self-help in that context. But the case *sub judice* is not a case involving distress for rent. Nor does *Quigley* preclude a commercial landlord from resorting to self-help to repossess its premises when, as here, the tenant is in breach of a commercial lease that expressly authorizes such a remedy. Moreover, any doubt as to whether self-help was precluded to recover possession under an express provision in a commercial lease was certainly put to rest in the subsequent case of *K & K Management*.

In any event, appellant's threat that it would resort to *judicial process* to repossess does not constitute "self-help" as that term is ordinarily construed in the case law. *Cf., e.g., K & K Management*, 316 Md. at 146, 557 A.2d 965 (landlord changed locks on leased premises while tenant was away and prevented tenant's access); *Postelle*, 115 Md.App. at 725, 694 A.2d 529 (landlord placed a lock on tenant's office and prevented tenant's access); *Toy Fair*, 177 F.Supp. at 133 (landlord changed locks and prevented tenant's access after having accepted rent); *see also Black's Law Dictionary* 1360 (6th ed.

1990) ("For example, a 'self-help eviction' may be a landlord's removing the tenant's property from an apartment and locking the door against the tenant...."). Nor do we believe that Armstrong's efforts at controlling access to the Airport, but which did not deny appellant access to the Airport, transformed the notice to quit to a self-help eviction.

■ Even if appellee's conduct constituted self-help, we remain satisfied that the eviction was not wrongful. In *K & K Management*, the Court defined wrongful or unlawful conduct, in relation to interference with economic relations, as: " 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.' " *K & K Management*, 316 Md. at 166, 557 A.2d 965 (quoting W. Prosser, *Handbook of the Law of Torts* 952–53 (4th ed.1971) (footnotes omitted)); *see also Macklin v. Robert Logan Assocs.*, 334 Md. 287, 300, 639 A.2d 112 (1994) (same; regarding interference with economic relationships); *Postelle*, 115 Md.App. at 732–33, 694 A.2d 529.

In our view, appellee's threat of possible criminal prosecution for trespass did not amount to wrongful conduct. As we noted, in the event of a breach by the tenant, appellee's right to re-enter was expressly authorized in the Leases. Without doubt, appellant was in breach of the Leases. Indeed, appellant's breach was not simply a failure to pay one month's rent or one month's utility bill; appellant had been several months in arrears, refused to make payment despite repeated warnings from appellee, and only paid the back rent after it was sued by appellee. Having terminated the Lease, pursuant to its terms, appellee was entitled to possession of the Airport premises, and appellee had a contractual right to re-enter and retake the Airport premises.

It was also undisputed that Armstrong gave appellant's employees one week to remove their property from the Airport. Had appellant remained on the Airport property, appellant could have been considered a trespasser. Thus, the threat to prosecute appellant and its employees was certainly

not "groundless." According to the *Restatement (Second) of Torts* § 185 (1965):

> A person entitled as owner to the immediate possession of land which is in the possession of another, who enters or remains on the land, does not thereby subject himself to liability for trespass on land.

Comment (a) to Section 185 makes clear that it is "immaterial that the manner in which the actor has entered is itself tortious.... Under these circumstances, an independent action may lie for the harm so caused to the person of the possessor or to his goods, but not an action for trespass to land."

■ Even if the eviction were wrongful, appellant did not suffer any injury for which it would have been entitled to damages. What we said in *Stevan* is pertinent here:

> "If the tenant was evicted by the landlord or by acts equivalent to an eviction was deprived of his pecuniary interest under the lease, he was entitled to recover as damages the loss suffered by him—to be put in the same position pecuniarily as he would have been if the contract had been kept—when the damages are the natural result of such breach of contract and can be ascertained with reasonable certainty."

*Stevan,* 54 Md.App. at 243, 458 A.2d 466 (quoting *Weighley v. Muller,* 51 Pa.Super. 125, 132 (1912)); *see also Postelle,* 115 Md.App. at 729, 694 A.2d 529. In this case, however, appellant was not deprived of any pecuniary interest because the Lease had been terminated as a result of appellant's breach. Because appellee did not breach the contract, there were no damages to which appellant would be entitled.

There was also no evidence of harm to appellant's employees or to its goods, and appellee did not "distrain" for rent. Instead, appellee merely issued a notice to vacate, permitted appellant and its employees one week to remove their effects, and then repossessed the Airport property. Neither Michael nor Armstrong threatened violence against appellant's employees. The uncontradicted evidence indicated that appel-

lant's employees left without protest. Jostein Brakvatne, a pilot for appellant, testified:

> I came in the morning and talked to some of the fellow employees at the airline there and they came in, of course, (inaudible) or—he [Armstrong] came into the airport and basically gave an eviction notice saying that we had to remove ourselves from the premises and I really didn't understand what was going on at the time, but we left the building. They gave us ample time to leave the building and also there was posted an eviction notice on the main door into the main terminal of the airport.

Even considering Armstrong's acts of controlling appellant's access to the Airport facilities after the Leases had been terminated, these acts, combined with the notice to quit, did not result in any harm to appellant's goods or employees. Thus, even if appellee's re-entry were considered "unlawful," in the sense that appellee threatened criminal prosecution for trespass, at best, appellant would be entitled to nominal damages. In this case, however, even nominal damages would result in a windfall, because appellant remained at the Airport, rent free, from the time it paid Michael in May 1990 until it vacated the Airport on August 17, 1990.

To be sure, when a lessor seeks to regain possession of its property from a breaching commercial tenant, the most appropriate means for doing so is by resort to the summary ejectment procedures in the Real Property Article. Nevertheless, we conclude that the court erred in finding that appellant suffered a wrongful eviction. Instead, we hold that appellant did not suffer a wrongful eviction when appellee, without force, and without resort to judicial process, re-entered and repossessed the Airport. Because we hold that the acts of the PHAA, Michael, and Armstrong did not constitute wrongful eviction, we need not consider whether they were imputable to appellee.

c. *Section 1983 claims*

42 U.S.C. § 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ..., subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress....

 To establish a cause of action under § 1983, a plaintiff must prove that it has suffered a "deprivation" of a right secured by the Constitution or other law of the United States and that the deprivation resulted from the conduct of a person who acted under the color of state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). Although § 1983 does not confer any substantive rights, *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S.Ct. 1905, 1915, 60 L.Ed.2d 508 (1979), if there is no violation of a federal right, there is no basis for a § 1983 cause of action. *See Screws v. United States*, 325 U.S. 91, 108, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945); *Mensh v. Dyer*, 956 F.2d 36, 39 (4th Cir.1991); *Clark v. Link*, 855 F.2d 156, 161 (4th Cir.1988). Moreover, a § 1983 suit may not be based solely upon a violation of state law or a state tort. *Clark*, 855 F.2d at 161.

 Municipal governments are "persons" that are subject to suit under § 1983 if the alleged unconstitutional action involves a government policy or custom. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). In order for municipal liability to attach, the claim must arise out of official action of the municipality or agent pursuant to official policy, decision, or custom. *Spell v. McDaniel*, 824 F.2d 1380, 1385–88 (4th Cir.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988).

 Appellant argues that it suffered constitutional deprivations related to its FBO component, which was covered by the Leases, and to its air carrier business, Cumberland Air Services, which was not subject to the Leases. Appellant's

**84**

claims regarding its air carrier business are based on the Airport and Airway Improvement Act of 1982,[7] 49 U.S.C. § 2201 *et seq.*, which specifically prevents discrimination at airports that receive federal funds. *Id.* § 2210(a). Appellant fails to cite any cases indicating that this statute gives rise to a private cause of action, and the case law indicates that it does not. *See, e.g., New England Legal Found. v. Massachusetts Port Auth.*, 883 F.2d 157, 168–70 (1st Cir.1989); *Western Air Lines, Inc. v. Port Auth.*, 817 F.2d 222, 225 (2d Cir.1987), *cert. denied sub nom. Delta Air Lines, Inc. v. Port Auth.*, 485 U.S. 1006, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988); *Interface Group, Inc. v. Massachusetts Port Auth.*, 816 F.2d 9, 15 (1st Cir. 1987); *Arrow Airways, Inc. v. Dade County*, 749 F.2d 1489, 1491 (11th Cir.1985); *Skydiving Ctr. v. St. Mary's County Airport Comm'n*, 823 F.Supp. 1273, 1279 n. 2. (D.Md.1993).[8] Because appellant does not have a private right of action under 49 U.S.C. § 2210, its claims regarding its air carrier service are without merit.

 We also question the validity of appellant's § 1983 claims relating to its FBO operation, based on the terminated Lease contract. *See Coastland Corp. v. County of Currituck*, 734 F.2d 175, 178 (4th Cir.1984) (holding no process due under § 1983 action for breach of government contract because "a suit for breach of contract would have provided [appellant] with an adequate remedy in state law"); *but see Blackwell v. Mayor of Delmar*, 841 F.Supp. 151, 157 (D.Md.1993) (holding that government contract that was terminable for cause may under some circumstances give rise to a property interest that is actionable under § 1983).

Even assuming that appellant had a cognizable interest under § 1983, we conclude that the trial court was not clearly

---

7. This provision has been recodified and is now located at 49 U.S.C.A. § 47107 (1997).

8. We note that appellant cited *Skydiving Ctr.* to the trial court, but did not do so in its brief to this Court.

erroneous in finding that appellant did not suffer any "deprivation." It stated:

> While it appears from the testimony and exhibits in this case that [appellee] attempted to restrict [appellant's] full use of the airport facilities before June 1990, it is undisputed that [appellant] continued to occupy the premises until eviction by PHAA on August 17 [1990]. For a portion of that time [appellant's] equipment, including all of its airplanes, had been removed by attachment pursuant to the West Virginia litigation. How much, if any, of [appellant's] then faltering business was inhibited solely by [appellee's] attempts at restriction is not clear from the evidence before the Court. For these reasons, the Court finds that judgment for [appellee] and against [appellant] on [the § 1983 claim] is appropriate.

Appellant makes several allegations of error regarding its constitutional claims. Appellant contends, for example, that the constitutional deprivations began March 27, 1990—the date that appellee sent notice that appellant's Leases were terminated—and continued beyond September 30, 1990—the end of the Lease term. We have already concluded that appellant's eviction on August 17, 1990, was not unlawful. Thus, we focus on the period between March 27, 1990 and August 17, 1990 for any constitutional deprivations.

At trial, Armstrong testified that a memorandum was hand-delivered to appellant on April 25, 1990, instructing it to "depart the terminal buildings [and] cease business activities." Armstrong further acknowledged that he had changed the locks on the offices used by appellant in the terminal building, and refused to provide appellant with a key. Nevertheless, he also said that appellant's employees used the offices and that he did not actually lock them. Moreover, although he locked the outside doors to the terminal building at the end of each day, Armstrong testified that he unlocked the outside doors daily. Armstrong also stated that he put a chain and lock on the fuel pumps at the terminal. Despite all these acts, however, Armstrong said that appellant continued to operate at the Airport. He stated: "They were there. They were

trying to establish business.... [T]hey were utilizing the lower level of the terminal building." He also noted that at some point between April 25, 1990 and August 17, 1990, appellant had "rehired one or two of the maintenance— previous Nicholson Air Services maintenance employees."

The evidence certainly suggest that appellant's operations at the Airport were limited at least as much by its financial difficulties as by the acts of appellee. As we observed earlier, the evidence showed that appellant was in serious financial difficulty during this period. Alfred D. Nicholson, appellant's president and majority stockholder until April 1990, conceded at a meeting of the Board on May 4, 1990, that he had been doing the best he could to keep the airline operating and to take care of his debts. He told the Board that he "got swindled" by a holding company in a deal that involved transfer of his interest in the company and that it was Shapiro who came in to "bail them out."

At trial, Shapiro testified that he became appellant's majority stockholder and president in April 1990, at which time he began efforts to revitalize the company. He testified:

[Shapiro]: We re-hired staff that had been allowed to go unpaid. We paid back wages to the staff. Brought everyone up current. We reinstituted charter service. We reinstituted, to the best of our ability, the maintenance. Again, I mention that we were locked out of our own equipment—the maintenance facility for part of the times. We had to request permission from Mr. Armstrong to open the facilities for us and allow us access to our tools and equipment. We attempted to do the fuel service for the community for people who came in and for our airline component. That was difficult. Again, the fuel was partially locked up. I purchased—Nicholson Air Services purchased a large supply of fuel, $20,000 worth or so of fuel, replenished the fuel tanks. Let's see. The—we had contracts with overnight delivery services, UPS, and we reinstated that and we did—I can't—at the moment the technical term, the proving flights. We continued—we started up our proving flights for the

airline. They were necessary to re-establish to meet the regulations for carrying passengers. There was a certain amount of required flights that we would have to do in and out of certain airports with each pilot having to meet certain requirements and we did that. We did some charter operation where we flew passengers, local community passengers, to their various chartered destinations.

[Appellant's Counsel]: What aircraft were you using during that time period of May 7th, 1990 to August 17, 1990?

[Shapiro]: There were two aircraft that we were using for the airline component and then there were two additional aircraft that we were using for business purposes.

\* \* \* \*

[Appellant's Counsel]: Is it your testimony that Cumberland Airlines was operating at the airport during the summer of 1990?

[Shapiro]: Yes.

[Appellant's Counsel]: And it was doing those things to which you previously testified?

[Shapiro]: Yes.

Viewing this evidence in the light most favorable to appellee, we conclude that there was substantial evidence to support the trial court's finding that appellee did not deprive appellant of its federal constitutional rights between March 27, 1990 and August 17, 1990. As the trial court correctly observed, Nicholson Air's assets were subject to attachment pursuant to the West Virginia court action between April 24, 1990 and May 7, 1990. The evidence further indicated that other assets were the subject of other legal proceedings, due to appellant's financial difficulties. In addition, the testimony clearly demonstrated that appellant had continued, albeit limited, access to the Airport and its FBO operation until August 17, 1990. Therefore, we hold that the trial court's findings were not clearly erroneous.

**88**

JUDGMENT AFFIRMED; APPELLANT TO PAY COSTS.