886 A.2d 900

DEPARTMENT OF HOUSING AND COMMUNITY
DEVELOPMENT, et al.

v.

Jon MULLEN, et ux.

No. 1691, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Oct. 5, 2005.

Reconsideration Denied Dec. 15, 2005.

628

Paul J. Cucuzzella, Asst. Atty. Gen., Annapolis (Jan M. Bryant, Asst. Atty. Gen, Crownsville, J. Joseph Curran, Jr., Atty. Gen., Baltimore, on the brief), for Appellants.

Keith A. Parsky, James A. Shrybman, Bethesda, for Appellees.

Panel: SALMON, KENNEY and MEREDITH, JJ.

SALMON, Judge.

Jon and Sally Mullen (the "Mullens") are curators of property known as Knock's Folly, located in Kent County. The Mullens' curatorship agreement, which is more fully described *infra*, provided that the Mullens personally would donate the funds necessary to restore and maintain Knock's Folly. In exchange for their gift, the Mullens were permitted to live on Knock's Folly rent and tax free, for the duration of their natural lives.[1]

In 1974, the Commissioners of Kent County acquired ownership of Knock's Folly. Kent County, in 1980, granted a conservation easement to the Maryland Historical Trust ("MHT"), which is a body corporate of the Department of Housing and Community Development ("DHCD"), an agency of the State of Maryland. The easement restricts the nature of the renovation and rehabilitation projects on the premises. Since 1990, Knock's Folly has been owned by the State of Maryland but is maintained under the care of the Department of Natural Resources ("DNR").

In the curatorship agreement entered into between the DNR and the Mullens, the Mullens acknowledged both the existence of the easement on the land and their obligation to obtain DNR's and MHT's permission for all renovation pro-

---

1. Sally Mullen was born in 1945; Jon Mullen is six years her senior.

jects. The curatorship agreement provided that failure to comply with any or all of its terms permitted DNR to terminate the agreement and thus cancel the Mullens' right to live at Knock's Folly.

Litigation commenced between the Mullens and the DNR (and others) in 2002. The details of that litigation will be set forth below, but broadly speaking, the trial judge resolved the dispute between the parties by making four major rulings, *viz.*

1. That the deed of easement granted to the MHT was a valid legal restriction as a condition of the gift of Knock's Folly from the Kent County Commissioners to the DNR;

2. The Knock's Folly property was subject to the easement under the curatorship agreement between the Mullens and DNR;

3. The Mullens breached the terms of both the curatorship agreement and the easement when they built certain structures on Knock's Folly without the approval of either the DNR or the MHT; and

4. Despite their breach of the curatorship agreement, the MHT and DNR were enjoined from enforcing some, but not all, rights spelled out in the Agreement.

MHT and DNR filed an appeal; the Mullens filed a timely cross-appeal.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Knock's Folly is a seventeen-acre parcel of land located on Turners Creek Landing Road in Kent County. The property is improved by a main house composed of two adjoining structures: a one and one-half story log house that was built in 1753 (approximately) and a three-story federal-style brick townhouse built at the dawn of the nineteenth century. The house is on the National Register of Historic Places.

Knock's Folly was deeded to the Commissioners of Kent County in 1974. Kent County, in 1980, granted a conservation easement in gross in the property to the MHT, with the goal

of promoting and preserving Knock's Folly's "historic, aesthetic and cultural character." The easement states that the MHT is funded by the "Heritage Conservation and Recreation Service and Maryland Historical Trust." MHT agreed when it accepted the easement to "comply with all requirements of the Heritage Conservation and Recreation Service made pursuant to the National Historic Preservation Act of 1966 ...." Kent County, in turn, agreed that it would not "cause, permit, or suffer" any building or other structure on the property without the consent of the MHT. The conservation easement further provided that it was binding upon the grantor's (Kent County's) successors and assigns.

On November 10, 1990, the Mullens entered into a Resident Curatorship Agreement ("Agreement") with the DNR in which they were designated as curators of Knock's Folly. Under the DNR's curatorship program, private citizens agree to donate personally the funds necessary to restore, renovate, and maintain historic properties. In exchange, the state grants the curators tax benefits, as well as a life estate in the premises, subject to certain conditions.

The Agreement contained strict guidelines regarding restoration and renovation work on the property. And, the Mullens agreed that in performing such work they would adhere to the Secretary of the Interior's "Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings" ("the Standards").[2]

The Agreement also contained the following clause:

---

**2.** The Standards provide, among other things:

1. A property shall be used for its historic purpose or be placed in a new use that requires minimal change to the defining characteristics of the building and its site and environment.

2. The historic character of a property shall be retained and preserved.

\* \* \*

9. New additions, exterior alterations, or related new construction shall not destroy historic materials that characterize the property. The new work shall be differentiated from the old and shall be compatible with the massing, size, scale, and architectural features to protect the historic integrity of the property and its environment.

> The [Mullens] acknowledge that the Premises are subject to a historic preservation easement held by [MHT]; *they furthermore acknowledge that all restoration work they perform on the premises is subject to approval by [MHT].*

(Emphasis added.)

A copy of MHT's historic preservation easement was attached to the Agreement. The Agreement further provided that the Mullens were required to contact MHT "prior to undertaking any excavation on the [p]remises" and "abide by [MHT's] recommendations ... to mitigate anticipated disturbance" from such work "provided that such recommendations are received in writing by the Curators ... within fourteen (14) calendar days from the date the Curators first contact [MHT]."

In addition, the Mullens agreed that all restoration work would be in accordance with a detailed schedule ("the Schedule"), which was a list of projects that the Mullens were expected to complete within five years of the date of signing the Agreement. The Schedule anticipated that the Mullens would contribute at least $315,047 to restore Knock's Folly. Although the Agreement contained a clause that allowed the Mullens to make "reasonable adjustments as work progress[ed]," without DNR's prior approval, any adjustments that "substantially alter[ed] the original intent and scope of the Schedule" required the prior approval of the DNR's Supervisor of Cultural Resources Management.

The Agreement also contained a termination clause that provided that DNR could terminate the Agreement upon sixty days' notice if the Mullens failed to "comply with any and/or all of [its] terms and conditions."

The relationship between the Mullens as curators and the DNR and the MHT operated smoothly for the first several years after the Agreement was signed. During this period, the Mullens substantially completed all the restoration work required on the historic home. As the circuit court was later to find,

[d]uring the term of the Agreement, the Mullens had opportunity on occasion to seek prior approval for projects at Knock's Folly that had not been contemplated in the Schedule. On at least one such occasion regarding the alteration to an interior staircase, the Mullens submitted detailed plans and specifications to MHT, through DNR, as requested prior to initiating the project. On this occasion, the MHT Board of Trustees reviewed the staircase plans submitted by the Mullens, approved the plans, and notified the Mullen[s] in writing, through DNR, that the plans had been approved.

. . . On numerous occasions, MHT provided the Mullens with written instructions and notifications regarding their obligations to seek MHT prior approval for projects at Knock's Folly that were outside the scope of the Schedule. . . .

On September 9, 1998, Mr. Mullen met with representatives from MHT, DNR, and the Critical Areas Commission [3] to discuss construction of a pool, a brick and iron fence, and a garage. Rodney Little ("Little"), the State historic preservation officer and director of the MHT, was present at a portion of the meeting. Little approved the construction of the pool, garage, and gates [4] on the condition that the gates would be built as a plain iron fence without brick posts rather than "wrought iron and brick," and as long as the MHT Easement Committee could review the final plans for the pool and the garage.[5] The Mullens never submitted these plans to MHT after the September 1998 meeting.

---

3. Knock's Folly bordered critical areas of the Chesapeake Bay. Therefore, any improvements on the exterior of the property had to be approved by the Critical Areas Commission.

4. Pictures in the record extract show two rather large brick pillars and one iron gate. Nevertheless, the parties and the trial judge refer to the structure as "the gates," and we have done so for purposes of consistency.

5. Mr. Little, at trial, denied that he gave even conditional approval, but the trial judge found otherwise.

▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬

Sometime between April and June 1999, the Mullens constructed a three-bay garage. The garage was located a short distance from the historic main house. It was forty-feet long, twenty-four-feet wide, and one and one-half stories in height and included an apartment on the second floor.

Ross Kimmel ("Kimmel"), the DNR Supervisor of Cultural Resources and Management, inspected the premises on June 23, 1999. At that time, construction of the garage was complete. Kimmel noted on his report that the garage had been built, but his report did not mention the new gates. In his report, Mr. Kimmel commented that there were no problems to be corrected at that time and that the property looked "better than ever." He did not, however, notify the MHT immediately about the "improvements."

In November 2000, Little notified the Mullens that MHT had learned about the construction of the garage and asked that the Mullens explain why they had built the structure without MHT's prior consent. Mr. Mullen responded in a letter dated November 17, 2000, in which he said that the garage was built to replace a shed that they had been using to store equipment needed to maintain the premises. He further explained that he followed the suggestions regarding the location of the garage and its design structure given to him at a "fall" 1998 meeting.[6]

---

6. The complete text of the letter was as follows:

Over two years ago in the fall of 1998, I met with you, Sarah Taylor Rodgers, Charles Mazurek, Mary Owens[,] and Mike Day at Knock's Folly to work out the details regarding our swimming pool and the removal of an existing shed. The shed was used to store my tractor, mowing equipment, etc., and measured approximately 24 feet by 50 feet.

It was agreed at that meeting that we could proceed with the pool construction, removal of the existing garage and put up a replacement building. It was suggested that we locate the new building between the pool and Turners Creek Road. The location of the new structure was dictated largely by the approximately 250 ft. set back requirement due to the continuous steep bank on the water side of the property. It was also determined that this location was sufficiently distant from the house as not to interfere or detract.

The MHT inspected the new garage and gates and, in a January 25, 2001, letter to DNR said:

[T]he scale, design, and materials are not appropriate for the site, and therefore in violation of Standard # 9 of the *Secretary of the Interior's Standards for the Rehabilitation of Historic Properties* [and that the] new construction would not have been approved even if it had been submitted for review in accordance with the terms of the easement.

On February 9, 2001, DNR directed the Mullens to "raze and remove" the garage and gates because they were in violation of the MHT easement.

During the next eleven months, the parties were unable to resolve their difference concerning the "improvements."

On January 10, 2002, DNR wrote a letter to the Mullens notifying them that the Agreement would be terminated if the unauthorized improvements were not cured within sixty days.

The parties attended a meeting in the spring of 2002 to attempt to settle disputed matters. The "raze and remove" deadline was extended until June 1, 2002. The DNR offered to resolve the matter "on the condition that Mullens either raze and remove the garage, or take off one bay from the garage and move the remaining structure to one of three alternative locations." The Mullens rejected the offer.

The Mullens filed a complaint in the circuit court against DNR, Department of Housing and Community Development ("DHCD"),[7] and Governor Parris Glendening on May 10, 2002. Plaintiffs sought to enjoin the defendants from (1) removing

---

The suggestion was made that a metal building was not desirable and I should construct a wooden structure incorporating design features compatible with the old house. I have taken great pains to follow your guidelines:
 1. beaded siding was used to match the cabin
 2. roof pitch and dormers to reflect the period
 3. exterior proportions fitting with the period.
Sally and I are saddened to find that our efforts to do the right and honorable thing at Knock's Folly continues to find disapproval within the Trust.

7. MHT is a body corporate of DHCD.

any new structures on Knock's Folly, (2) disturbing the Mullens in the quiet enjoyment of their life estate on Knock's Folly, or (3) terminating the Agreement. In their complaint, the Mullens contended that they were entitled to an injunction for two reasons. First, the deed of easement granted to the MHT had been "extinguished" by the doctrine of merger in 1990, when the owner of the servient estate (the State of Maryland to the use of the DNR) and the grantee (MHT, an agency of the State of Maryland) of the easement became one and the same. Second, even if the easement granted to the MHT was still legally valid, the Mullens *did* obtain prior approval of the MHT before it commenced construction of the garage and gates.

On the same date that they filed their complaint asking for an injunction, the Mullens filed a "Motion for Declaratory Judgment," in which they framed the question to be resolved as:

> Does MHT possess the approval authority over work done at the Subject Property based on the easement that they were granted in 1980?

The court was asked to answer that question in the negative and declare

> that the easement granted by Kent County to the State of Maryland–MHT, was subsequently extinguished by merger when Kent County conveyed [Knock's Folly] in fee simple to the State of Maryland–DNR.

DNR and DHCD both filed answers to the Mullens' verified complaint and plaintiffs' "motion" for declaratory judgment. DNR also filed a counterclaim for declaratory judgment in which it asked the court to declare:

1. "[T]he MHT Deed of Easement is a valid legal restriction as a condition of the gift of Knock's Folly from the Commissioners of Kent County to DNR";

2. "[T]he MHT Deed of Easement is a valid legal restriction as part of DNR's agreement to accept a gift of land under State law";

3. "Knock's Folly is subject to the terms of the MHT Deed of Easement under the Mullens' Curatorship Agreement with DNR";

4. "[T]he Mullens are required to obtain the approval of MHT for all restoration work on the Premises under their Curatorship Agreement with DNR";

5. "[B]y executing the Curatorship Agreement, the Mullens waived their right to challenge the validity of the MHT Deed of Easement"; and

6. "[B]y executing the Curatorship Agreement, the Mullens waived their right to challenge their acknowledgment that all restoration work is subject to approval by MHT."

Governor Glendening, by counsel, filed a motion to dismiss the complaint and the declaratory judgment action filed against him. He asserted that the Mullens had failed to state a claim for which relief could be granted as to him. The Mullens opposed the motion, but the court subsequently granted it.

The Mullens filed a motion for summary judgment on August 30, 2002. Movants requested, among other things, that the court find that MHT's easement was extinguished by merger when the State acquired title to Knock's Folly in 1990. DNR and DHCD filed an opposition to the Mullens' motion, as well as a joint motion for summary judgment on September 19, 2002. In their joint motion, the defendants asked the court to rule that they were entitled to a declaration of all the rights requested of the court in DNR's counterclaim for declaratory relief. The Mullens subsequently filed a motion to strike DNR's and DHCD's opposition and their joint motion for summary judgment because, purportedly, the opposition and motion were filed untimely.

On September 30, 2002, the court denied the Mullens' motion to strike and granted DNR's and DHCD's joint motion for summary judgment regarding DNR's counterclaim for declaratory relief. The court declared that Knock's Folly was subject to the MHT easement. The court also declared, *inter*

*alia,* that the Mullens waived their right to "challenge their acknowledgment that all restoration work at Knock's Folly was subject to approval by MHT" when they signed the Curatorship Agreement.[8]

## II.

### A. *Trial—Stage No. 1 of the Bench Trial*

A bench trial was held on July 14, 15, and 16, 2003, concerning the Mullens' request for an injunction. The focus of Stage 1 of that trial concerned the issue of whether the Mullens had violated the terms of the Agreement by constructing the garage and gates without prior approval of either DNR or MHT.

Only a brief summary of the Stage 1 evidence is set forth below because the trial court found, and the Mullens do not challenge the finding, that the appellees/cross-appellants did breach the terms of the Agreement by building the gates and garage without obtaining the necessary prior consent from the MHT.

Mrs. Mullen testified on direct examination that she believed she and her husband had MHT's permission to build the garage, but the force of that testimony was eliminated when she admitted on cross-examination that she (1) never heard the MHT grant oral permission and (2) never saw any writing from MHT evidencing such permission.

Mr. Mullen testified that the curatorship program involved what he called "two phases." Phase 1 encompassed all restoration work on the main house. Phase 2 involved all other needed improvements to the premises.

Mr. Mullen said that he believed Kimmel, DNR's agent, had authority to approve projects that were outside the scope and intent of the Schedule. Usually, if permission from MHT was needed, requests were made by him through Mr. Kimmel. He admitted, however, that sometimes Kimmel would ask him to

---

8. The motion for summary judgment filed by the Mullens was denied.

go directly to MHT for approval of proposed projects at Knock's Folly.

On direct examination, Mr. Mullen said that at a September 1998 meeting, he received permission from MHT's Little and from Michael Day (another MHT agent), to construct the garage. According to Mr. Mullen, MHT's agents did not require that he submit anything to MHT before beginning construction. Mr. Mullen also said that the idea for constructing a new garage "evolved" at the September 1998 meeting when the parties realized that an existing implement shed had to be torn down. He did not claim that he either asked for or obtained permission from either DNR or the MHT prior to constructing the brick and iron gates.

On cross-examination, Mr. Mullen admitted that he had testified previously in an October 11, 2002, deposition that he never actually asked MHT for its approval to construct the garage. Mr. Mullen also admitted that he never received written approval to build the garage from DNR prior to constructing it. He further admitted that before building the garage he received a November 9, 1998, letter sent by the Critical Area Commission to DNR that read "Mr. Mullen shall obtain *final approval* of the swimming pool location, design, *and associated site improvements* from the [MHT] prior to starting construction." (Emphasis added.) No such final approval was ever obtained.

Mr. Kimmel testified that it was his responsibility to "keep in contact with the curators to get answers for the questions they may have, to involve other experts as necessary to give guidance when [he] wasn't competent to give guidance," and to put the curators "on notice that they had to make a correction" if he did not approve an improvement.

Mr. Kimmel testified that he neither received approval from MHT nor did he give approval to the Mullens to construct the garage or the brick and iron gates prior to the construction of those structures.

As mentioned earlier, the Mullens said in a November 2001 letter to the MHT that they built the garage based on a

conversation in the "fall" of 1998 [9] with officials of the MHT (i.e., Messrs. Little and Day). Mr. Kimmel testified that on May 30, 2001, he had a phone conversation with Mr. Mullen in which he asked Mr. Mullen about what had transpired at the meeting to which he referred, i.e., the meeting that took place on September 9, 1998. A memo concerning that conversation, which Kimmel said was accurate, was read into the record, *viz.:*

Attending the meeting were the following people: John [sic] Mullen, Jim Hastings (contractor), Sarah Taylor–Rogers [then secretary of the DNR], Mary Owens (Critical Areas), Charles Mazurek (SFPS), Michael Day (MHT) and Rodney Little. Rodney was the last one to arrive and the first to leave. Jon thinks Rodney spent no more than five or six minutes on site.

The purpose of the meeting was for Rodney to make a final determination as to the location of a swimming pool on the premises. Rodney has final authority on easement issues, subject to advice only from the Easement Committee. Jon had the pool location outlined on the ground with string, and had the springhouse pool building in place. Jon also had put survey flags in the ground to mark the corners of his proposed garage.

Rodney walked from the parking area through the garden and into the kitchen addition of the house. Jon offered a full tour of the house, but Rodney only saw—at the most— the ground floor. He walked back out through the garden and looked at the string outline of the pool, and okayed that. Jon asked about removing the three-bay, 1950s pole barn-garage and asked about building a replacement on the location marked by the survey flags. *Rodney agreed in principle, but asked that drawings of the final garage be submitted to the Easement Committee for approval.* Rodney got in his car and left. Sarah and Mary left shortly

9. When Mr. Mullen referred to a "fall" 1998 meeting, he meant the September 9, 1998, meeting, as shown by the allegations in the Mullens' complaint.

thereafter. Michael Day, Charles Mazurek, Bob Hastings, and Jon Mullen remained.

Jon asked Michael if he (Jon) has heard right, that Rodney okayed the location of the replacement garage, and Michael said yes, *contingent upon Easement Committee approval of the drawings.* Michael then gave Jon verbal guidelines as to what the garage should look like, construction details, etc., in order to pass muster with the Easement Committee. Here is the critical point: *Jon admits that he elected to build the garage according to the guidelines Michael gave him verbally and not to submit plans to the Easement Committee first.* His rationale was, based on previous dealings with the Trust, that they would drag things out for a year or more trying to make up their minds, maybe change their minds, etc., and he decided just to build on Rodney's verbal approval, with Michael's verbal guidelines, *but without getting Easement Committee input.*

To my mind, this explanation comes close to reconciling the two versions of the story that we have all been hearing, to wit, "The Trust gave me permission" (Mullen); "No we didn't" (Trust). Yes they did, but contingent upon their approval drawings, which Jon did not submit.

(Emphasis added.)

Little, who at all times here pertinent was the director of the MHT and its chief of staff, testified that when MHT learned that the Mullens had violated the easement on prior occasions, MHT would notify the Mullens about the violations and remind them that they needed MHT's approval for all construction projects. Little testified that he attended a meeting in September 1998 with Mr. Mullen and others to discuss constructing a pool on the property; according to Mr. Little, however, the subject of building a garage was not discussed.

DNR and DHCD made a motion for judgment [10] in their favor at the close of the Mullens' case. *See* Md. Rule 2–519.

---

10. In the trial court and in appellate briefs, counsel referred to the motion as one for a "directed verdict." Maryland judges have never

In a written order, filed July 22, 2003, the motion by DNR and MHT was granted. *See* Md. Rule 2–519(b). Included in the court's order were several findings, including the following important ones:

> Upon the terms of the Agreement, the Mullens acknowledged "that the Premises [were] subject to a historic preservation easement held by [MHT]," which was attached to the Agreement as Appendix G, and further acknowledged "that all restoration work they performed on the premises is subject to approval by [MHT]."

> \* \* \*

> . . . Sometime after November of 1998 the Mullens constructed or caused to be constructed on the Premises (1) a three-bay, one-and-one-half story garage (the "garage") and (2) two brick and iron gates at either driveway entrance (the "gates"). Both projects were outside the scope of the Schedule *and both constituted changes and alterations as contemplated in the Easement.*

> . . . At a meeting that occurred at Knock's [Folly] on or about September 9, 1998, Mr. Little gave conceptual approval to *Mr. Mullen for construction of a garage contingent upon the submission by the Mullens of detailed plans and specifications for the garage to MHT for prior review and approval. Plans and specifications as required for the garage were never submitted by the Mullens.*

> . . . Similarly, *the Mullens never submitted plans and specification[s] to MHT for the gates prior to their construction.*

> . . . MHT, or anyone acting with proper authority on its behalf, never gave consent or approval to the Mullens for construction of either garage or the gates.

> . . . Ross Kimmel, a DNR employee and the Supervisor under the Agreement, lacked the authority to act on MHT's

---

been authorized to grant a "directed verdict" after a bench trial. Since July 1, 1984, the correct name for the motion is a motion for judgment.

behalf. In any event, Mr. Kimmel did not give prior consent or approval for either the garage or the gates.

... The Mullens' failures to obtain prior consent or approval from MHT for construction of the garage and gates *constituted a violation of the Easement and a breach of the Agreement.*

... *The construction of the garage and gates substantially altered the scope and intent of the Agreement.*

(Emphasis added.)

### B. *The Remedies Hearing*

On August 25, 2003, the court held a "remedies hearing" to determine DNR's rights under the Agreement in light of the court's determination that the Mullens had violated the Agreement by erecting the gates and garage without the prior approval of either DNR or MHT.

Mr. Little testified at the remedies hearing that both the garage and the gates violated the Secretary of the Interior's Standards, and it was for that reason that the Easement Committee of the MHT disapproved of the construction. In regard to the entrance gates, he said:

[T]he gates violate ... the rehabilitation standard number six, and reconstruction standards 1, 4, 5, and 6, because each of those relate[s] to basing any construction that you do on a historic site on documentary and physical evidence. And there ... has not been any documentary or physical evidence presented to us that there were in fact gates on the property during the period of historic significance of the property. The gates also violate rehabilitation standard number 8, and reconstruction standards 2 and 3, because the gates were constructed without doing any archeology prior to their construction.

\* \* \*

... In order to build the constraints ... the gates subsurface, disturbance was necessary. And, in the course of doing so, any archeological evidence that was in the ground would be destroyed, including, I might add, if there

had ever been original gates in that location, the evidence of those gates probably would have been destroyed.

\* \* \*

The gates also violate rehabilitation standard number 9, because their design, material and location are incompatible with the historical character and integrity of the property. They are quite intrusive on the historic setting on the property. And, if you're driving from either direction along [Turner's Creek Landing] Road, it's one of the first things you see, and they're quite prominent.

Mr. Little also testified that to build the three-bay garage "substantial excavation" was necessary. This violated Standard 8 (for rehabilitation) because the excavation was done

without any attempt to identify whether there were archeological sites there that would be disturbed and also without any attempt to mitigate the destruction of those archeological materials. So whatever artifacts and information were there have been irretrievably lost and cannot be brought back.

Furthermore, according to Mr. Little,

[T]he garage also violates rehabilitation standard number 9, because it's [sic] size, location and design substantially damage . . . the integrity of the property and the characteristics, which make it . . . significant. The . . . property was, in the late eighteenth and nineteenth centuries, obviously an agricultural property. And it was the agricultural character, along with the character of the house and outbuildings, that gave the whole ensemble . . . its character altogether. The garage is out of keeping with that character. For example there has . . . been discussion of the equipment shed that the garage supposedly replaced. That shed was there when we were looking that day at the pool. . The shed in question was a much smaller, much less intrusive structure. It was very low. Even to call it one story would be to almost exaggerate it. Had a shed roof. It was built up on poles. It was open sided. And, like other out buildings of that type, it more or less disappears into the background.

It's very light. It does not certainly become a focal point. It doesn't compete with the house. And that's the way agricultural outbuildings typically are constructed. They're plain and simple. They're of rough materials. They tend to recede into the background when you compare them with the providence of the main house. The garage in question is very different. *The garage is not agricultural in nature. It's clearly residential. Do I think the garage is ugly? No. However, where does it belong? It belongs in a modern suburban tract development, not with a late eighteenth/early nineteenth century historic farmstead.* It is an intrusion on the landscape not only because of it's [sic] size and design and materials but, in particular, because of it's [sic] location.

(Emphasis added.)

In addition, the location of the garage in relation to the main house was a serious problem according to Mr. Little, because as one approaches Knock's Folly on Turners Creek Road, the garage blocks the view of the main house until one gets "much closer to it."

The trial judge, accompanied by the attorneys for the parties, went to view Knock's Folly on August 25, 2003. Based on his inspection of the property and the evidence he had heard, the trial judge made the following findings of fact, among others:

5. The testimony of Mr. Little (MHT Director) reflected an objective basis behind his reasons that the structures are objectionable. There is a rationale for MHT's declining the construction of these structures.

6. If this matter were to be viewed in a purely contract setting, DNR's arguments with regard to exclusive remedy would prevail. It is difficult, however, to view these matters in a purely contractual setting due to the nature of the entire relationship.

7. *The [p]laintiffs substantially performed their duties under the Resident Curatorship Agreement to the extent that the primary objectives of the agreement deal*

▬▬▬▬▬▬▬

*with the restoration of the house, and they have performed that admirably.*

8. The MHT easement, however, as well as other terms of the Resident Curatorship Agreement, affect the entire subject property. The construction of the carriage house/guest cottage [11] and the gates without permission violated the terms of both of those agreements. However, it is noted that subsequent to their construction, the DNR Supervisor did submit an official Site Inspection Report indicating that there were no problems.

9. A person undertaking the curatorship of a property such as this, with the over twenty acres of property to maintain, requires certain equipment and, therefore, it is appropriate to have some storage facility.

10. The critical areas buffer line restricts the location of such an outbuilding.

11. The subject building is located in close proximity to the location of a former implement shed.

12. The subject building is located a substantial distance (several yards) from the (main) house.

13. When one drives down Turners Creek Road, the first thing that catches the eye is the subject building [the garage]. It does not block the view of the house. It is obvious that its existence there would block some view.

14. The view of the house from the road is restricted, and historically was restricted by trees on the property.

15. If one moves the subject building closer to Kennedyville, or away from the house somewhat, a few more feet, so that it doesn't impinge upon the critical area buffer line, it may reduce its view blocking abilities. It

---

**11.** In his opinion concerning remedies, the trial judge referred to the garage as a "carriage house/guest cottage." Pictures of the structure, which appear in the record, depict the building as a modern looking, three-bay garage with an apartment on the top floor.

can't be moved any closer to the road, or it would definitely block the view of the house.

16. *It is equitable to allow the building to stay where it is subject to possible screening and painting it a different color, although the former building (implement shed) was white as well.*

17. The subject building could be moved. But then one would face the problem of where to move it, considering the costs involved and the restrictions of the critical areas buffer line.

18. The subject building, to which the curator would be entitled, should have doors and the ability to be locked.

19. It is appropriate that the curators be able to have a gate or gates to provide for privacy and to prevent unwanted visitors.

20. The gates constructed by the curators are more extravagant than anything that may have once been there. *To that extent, the [c]ourt denies the injunction* [to prohibit] the removal of the gates and permits them to be removed. But the curators are entitled to a gate appropriate to Knock's Folly. It would also be appropriate for the curator to have the gates constructed out of something that requires less maintenance.

(Emphasis added.)

On September 9, 2003, the court signed an order, which provided

that the equities dictate that the carriage house shall remain where it is during the term of the Agreement and therefore the Mullens' request to enjoin removal or destruction of the carriage house is granted; and it is

**FURTHER ORDERED** that the appropriate means, as approved by MHT and DNR, shall be used to visually screen or soften the view of the carriage house from the eyes of approaching visitors; and it is

**FURTHER ORDERED** that the Mullens' request to enjoin removal or destruction of the gates is denied and

DNR and MHT may require the Mullens to remove the gates; and it is

**FURTHER ORDERED** that, if required to remove the gates, the Mullens may replace the gates with gates that are appropriate to the historical significance of the property as approved by MHT and DNR; and it is

**FURTHER ORDERED** that all prior findings and orders in this case are incorporated by reference into this Final Judgment.

### III.

DNR and DHCD (appellants) argue:

The trial court erred when it denied DNR the authority to enforce the remedy provided in the Curatorship Agreement, and rather imposed upon DNR [the requirement] that it must maintain, on its own property, garage and gates constructed by the Mullens in violation of both the Curatorship Agreement and of DNR's obligation under the easement.

Appellants contend: (1) the contractual remedy agreed upon by the parties was that if the Mullens breached the Agreement, then DNR had the right to terminate the Agreement; (2) the court found, correctly, that the Mullens breached the Agreement by constructing the garage and the gates without the permission of either the DNR or the MHT; and (3) the trial court has "no authority to invoke, on [its] own accord, a remedy alternative to the one bargained for, even if enforcement of the contractual remedy may result in hardship" (citing, *inter alia, Massachusetts Indemnity & Life Ins. Co. v. Dresser,* 269 Md. 364, 369–70, 306 A.2d 213 (1973); *Holzman v. Fiola Blum, Inc.,* 125 Md.App. 602, 620, 726 A.2d 818 (1999); *Fultz v. Shaffer,* 111 Md.App. 278, 298, 681 A.2d 568 (1996); *Stueber v. Arrowhead Farm Estates Ltd. P'ship,* 69 Md.App. 775, 780–81, 519 A.2d 816 (1987)).

Appellants place primary reliance on *Stueber v. Arrowhead Farm Estates,* which involved an equitable suit for specific performance by the Stuebers, who sold 66 acres of land to a

partnership that planned to subdivide the property. 69 Md. App. at 777, 519 A.2d 816. Under the sales contract, the sellers were to receive, *inter alia*, fifty percent of the net proceeds from the sale of each lot sold to third parties by the purchasers. The purchasers agreed that Section 1 of the subdivision that they planned to build was to be completed no later than January 21, 1984. The purchasers, however, failed to meet that deadline. *Id.* at 778, 519 A.2d 816. The sales contract contained a default clause that read as follows:

> "DEFAULT BY PURCHASERS—PARTNERSHIP. *In the event that the Purchasers—Partnership default on any provision of this Agreement, all remaining lots shall be deeded back to the Sellers at no cost or expense to them, including, but not limited to transfer and documentary taxes.* ... The Partnership will also be responsible for any and all restoration costs as may be required by State and/or County authorities.... *This clause represents the Sellers' entire legal remedy in the event of a default hereunder.*" (emphasis added).

*Id.* at 778–79, 519 A.2d 816.

The sellers sued the purchasers, asking for specific performance of the default provision. *Id.* at 778, 519 A.2d 816. The trial judge found that the purchasers had defaulted but denied the sellers relief on the ground that specific performance was "too harsh a remedy for [d]efendants' default." *Id.* at 779, 519 A.2d 816.

The precise question presented in *Stueber* was:

> [W]here a contract for the sale of property provides an exclusive remedy upon breach, may a court, having found a default, nevertheless ignore the remedy and enter a judgment for the errant party?

*Id.* at 776, 519 A.2d 816.

In *Stueber*, we answered it in the negative, stating:

> We conclude that under the circumstances of this case the court is not permitted to rewrite the contract and thereby substitute its will for that of the contracting parties. Because the Circuit Court for Anne Arundel County did

precisely that, we reverse its judgment and remand the matter to that court with instructions that it order reconveyance of the property to the appellants. . . .

*Id.*

Later, the *Stueber* Court said:

The trial judge expounded in his oral opinion that the court "was not in a position where it should rewrite contracts . . . entered into between responsible parties." Yet, that is precisely what the court did. Notwithstanding the clear and unambiguous language of the agreement that in the event of default by the purchaser of the property would be reconveyed to the seller and that the reconveyance was the "Sellers' entire legal remedy," the trial judge read that clause out of the contract and suggested monetary damages which he then denied as too speculative.

*We share the trial court's recognition that Arrowhead [the partnership that purchased the property] will suffer substantial damages* for its default. Yet, it was Arrowhead, a limited partnership of persons skilled in the law and business who agreed to the terms of the contract of purchase. It was Arrowhead who agreed to the reconveyance language. It was Arrowhead who, inferentially at least, limited the Stuebers to reconveyance as their only remedy in the event of default. It was Arrowhead, not the Stuebers, who, after the complaint was filed, expended large sums of money, thereby creating an additional hardship for itself.

*Id.* at 780, 519 A.2d 816.

*Kahn v. Janowski,* 191 Md. 279, 60 A.2d 519 (1948), was another case involving a contract for the sale of land and dealt with the issue of when a forfeiture [12] was warranted. The contract of sale, which was signed in November of 1942, provided that the Kahns would sell the properties to the

---

12. A forfeiture was defined in *Kahn* as a "loss and deprivation of property in consequence of some offense or breach of duty." 191 Md. at 287, 60 A.2d 519.

Janowskis for $3,900. In addition, the purchasers agreed to assume the ground rent, together with a mortgage that encumbered the property, which had a balance of $1,400. The mortgage was to be paid off by the purchasers at the rate of $60 per month. The sellers, in turn, agreed to pay all taxes, interest on mortgage, and insurance premium until the date of settlement. Purchasers also agreed to pay for repairs and water rent. *Id.* at 283, 60 A.2d 519. The contract, however,

> reserved to either the seller or the purchasers the option to rescind the contract at any time up to December 1, 1948, with the proviso that in the case of rescission, the monthly payments made by the purchasers shall be forfeited and considered as rent for the property.

*Id.*

According to a complaint that was later filed by the purchasers, the sellers informed them for the first time in May of 1947 that they intended to cancel the contract and treat them as lessees. *Id.* at 283, 60 A.2d 519. The purchasers alleged that they had paid $3,300 on the purchase price through May 1947, had painted the house at an expense of $350, built a porch at the rear of the house, installed a hot water tank and gas heater, and made other substantial improvements on the property. *Id.* at 283, 60 A.2d 519. In their complaint, the purchasers asked the court to grant

> (1) specific performance of the contract, (2) an injunction against dispossession, (3) an accounting to determine the amount due under the contract, and (4) a declaration that the property was impressed with a trust for the benefit of [the purchasers].

*Id.*

The sellers demurred to the bill; the demurrer was overruled, and the sellers filed an appeal. *Id.*

> The Court of Appeals said in *Kahn:*
> Where the right to terminate a contract is reserved in the instrument itself, in the absence of fraud, undue influence, or mistake, such reservation is valid and will be enforced, if not contrary to equity and good conscience.

*Id.* at 286, 60 A.2d 519 (citing *Morrissey v. Broomal,* 37 Neb. 766, 56 N.W. 383 (1893); *Republic Coal Co. v. W.G. Block Co.,* 195 Iowa 321, 190 N.W. 530, 534 (1922)).

The *Kahn* Court went on to say:

On the other hand, the doctrine has been adopted in equity that conditions and clauses of nullity are not to be executed according to the rigor of their terms so as to cause forfeitures, but each case should be submitted to the discretion of the court for a decision according to the nature and object of the provisions and all the circumstances of the case. This doctrine had long been established in the Roman law upon the principles of natural justice. The jurisdiction to relieve against forfeitures is exercised on the principle that a party *having a legal right shall not be permitted to avail himself of it for purposes of injustice and oppression.* As Justice Story pointed out, equity should mold the law of penalties and forfeitures into harmony with more humane standards of conduct, and provide some means of preventing the mischiefs of improvidence and blind confidence on the one side, and cunning and avarice and a gross violation of morality on the other. 3 STORY, EQUITY JURISPRUDENCE, 14th Ed. sec. 1728.

*Id.* at 286, 60 A.2d 519 (emphasis added).

The Maryland Court of Appeals in *Kahn* concluded that the complaint as written did not show that the purchasers were entitled to specific performance but did show that they might be entitled to other equitable relief prayed for in the bill of complaint, i.e., an injunction against dispossession, an accounting to determine the amount due under the contract, and a declaration that the property was impressed with a trust for the benefit of the purchasers.

■ The Mullens attempt to counter appellants' argument that the trial court had no choice but to allow a forfeiture of their rights under the Curatorship Agreement by pointing out that the trial court, when it granted the injunction here at issue, was sitting in equity. The Mullens argue that all the cases cited by appellants were cases where only a legal

remedy was sought. This argument overlooks the fact that *Stueber*, upon which appellants primarily rely, was a case in equity asking for specific performance.

In *Nicholson Air Servs., Inc. v. Bd. of County Comm'rs of Allegany Co.*, 120 Md.App. 47, 706 A.2d 124 (1998), Judge Hollander, for this Court, spelled out, in some detail, the Maryland law concerning the issue of when a court may grant equitable relief from forfeiture of a lease or other contract. The Court said:

> Equitable relief from forfeiture is a cousin of the legal doctrine of waiver. It is "an offshoot of the disfavor with which the courts will view a forfeiture." *Rose and Crown* [*Ltd. v. Shaw Enters., Inc.*], 28 Md.App. [548,] 557, 346 A.2d 459 [(1975)] .... As the Court observed in that case, *"Courts of equity are only closed against the tenant where the forfeiture is incurred by his wilful and culpable neglect to fulfill the terms of his covenant and not in cases where the omission has been occasioned by an inevitable accident.* And the general rule to be applied to all such cases seems to be that Courts of equity will relieve where the omission and subsequent forfeiture are the result of mistake or accident and the injury and the inconvenience arising from it are capable of compensation; but where the transaction is wilful, or the compensation impracticable, they invariably refuse to interfere."
> *Id.* at 558, 346 A.2d 459 ... (quoting *Wylie v. Kirby*, 115 Md. 282, 287, 80 A. 962 (1911)) ... (emphasis and internal quotation omitted).

*Id.* at 70–71, 706 A.2d 124 (emphasis added).

We glean from our review of the Maryland cases that there are some cases where a court legitimately may grant equitable relief from a forfeiture, even though a contract provides that forfeiture is the exclusive remedy. Nevertheless, it is clear that courts should not intervene to prevent a forfeiture where the person seeking equitable relief wilfully breached a covenant in the contract or where compensation for the breach is impracticable. *See Wylie v. Kirby*, 115 Md.

at 287, 80 A. 962; *Nicholson,* 120 Md.App. at 70–71, 706 A.2d 124.

In the case *sub judice,* the finding of fact made by the court when it granted judgment to the appellants at the end of Phase No. 1 makes it clear that the Mullens, prior to the construction of the garage and the gates, knew that they needed the prior approval of both the DNR and MHT. Despite this knowledge, the appellees obtained no such prior approval. The trial judge found that at the meeting on September 9, 1998, MHT's representative, Mr. Little, gave only conceptual approval to Mr. Mullen for construction of a garage, but that conceptual approval was "contingent upon the submission by the Mullens of detailed plans and specifications for the garage to MHT [for its] prior review and approval," which was never obtained. In regard to building the gates, the Mullens did not obtain even conceptual approval from either DNR or MHT at any time prior to erecting the gates.

The Mullens point out that the remedy available to them at law was "wholly inadequate." This, of course, is true. But, as shown in *Stueber, supra,* this does not necessarily mean that a court in equity should provide relief. This is particularly so in this case where, in their complaint, the only ground for an injunction was their claim that they *did* obtain the requisite permissions prior to erecting the garage and the gates and, alternatively, preapproval was not needed because the easement was void. The trial court, however, ruled against the Mullens on both points, and in this appeal, the Mullens do not contend that the court erred in this regard.

We agree with appellants that, of all the cases cited by the parties, *Stueber* is the one most apposite. Here, as in *Stueber,* the sole remedy available to the non-breaching party under the Agreement is forfeiture. The breach of the covenant was not accidental and monetary compensation to the appellants will not fulfill the purpose of the Agreement. And, as will be shown, *infra,* the breach was material. Under the circumstances of this case, we hold that the trial court abused its discretion when it granted the injunction in this case, even

though the ground for the injunction as set forth in the Mullens' complaint was not proven and the breach was intentional.

The Mullens, as a back-up argument, contend that the trial court acted correctly in granting the injunction because the appellants were equitably estopped from asserting complaints about "conditions of which ... [they were] aware, could have acted in a timely manner, and did not act." For the doctrine of equitable estoppel to be applicable, three items must be proven: (1) voluntary conduct or representation; (2) reliance; and (3) detriment. *See Heartwood 88, Inc. v. Montgomery County,* 156 Md.App. 333, 368–69, 846 A.2d 1096 (2004) (citing *Markov v. Markov,* 360 Md. 296, 307, 758 A.2d 75 (2000)). An "estopped party is ... 'absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed ... against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.' " *Id.* (citing *Cunninghame v. Cunninghame,* 364 Md. 266, 289, 772 A.2d 1188 (2001) (internal quotations and citations omitted)).

Contrary to the Mullens' contention, the doctrine of equitable estoppel is here inapplicable. The Mullens presented not a scintilla of evidence showing that they relied to their detriment on any action or representation from either of the appellants. Both the garage and the gates were erected prior to obtaining the approval to either of the appellants or their agents. Nothing in the record supports appellants' (implied) contention that after appellants obtained knowledge of the construction of either the garage or the gates, the inaction of appellants in any way was detrimentally relied upon by them.

The Mullens next contend that the trial judge's grant of an injunction was justified by the fact that they had "substantially performed" their obligations under the contract. According to the Mullens, because they "substantially complied with the contract," the trial court correctly concluded

that they were entitled to an injunction preventing the appellants from either terminating the agreement or forcing them to remove the garage that was placed on the premises without appellants' prior approval.

In *Presstman v. Fine*, 162 Md. 133, 159 A. 265 (1932), the Court of Appeals discussed the doctrine of substantial compliance in a case that did not arise out of a building contract. The parties in that case were business partners who borrowed money from various contractors, whom they were unable to repay. The partners filed for bankruptcy and later obtained discharge of all their debts. *Id.* at 134, 159 A. 265. Despite the bankruptcy discharge, both partners desired to repay in full certain creditors. Accordingly, the two partners, Isadore Fine and Hyman Presstman, entered into a contract whereby Fine agreed to pay certain specified creditors and Presstman would thereafter repay Fine one-half of the amount paid. Fine repaid the creditors all the monies due, save for "a small part of one of" the creditors' claims. *Id.* at 135, 159 A. 265. Presstman refused to pay his fifty percent share, claiming that he was not required to pay anything until Fine had paid all the claims in full. *Id.* The jury returned a verdict in the amount of $1,500 in favor of Fine against Presstman, and Presstman appealed. In *Presstman v. Fine*, the Court of Appeals discussed the doctrine of substantial compliance, *viz.*:

> The jury evidently believed plaintiff's story and gave him a verdict of $1,500. If the story was true, there had been a substantial compliance by plaintiff at the time of bringing suit, even if that agreement required him to pay all the claims in full before he could have any demand upon defendant. The verdict of the jury was for $1,500, which left more than enough in defendant's hands, of the $2,150 which plaintiff claimed, to pay the balance due the one creditor whom plaintiff had not paid in full at the time of bringing suit. In such circumstances the case should not be sent back for a new trial on a bare technicality.
>
> * * *

In *Speed v. Bailey*, 153 Md. 655, 661, 139 A. 534 ... [(1927)], it is said that while the doctrine of substantial

compliance has been more widely applied to building contracts, it has not been confined to them, but has been applied in many cases *where the breach was relatively small as compared to the whole contract and did not go to the root of the contract;* that is to say, it is applied where the breach complained of is inconsequential in its nature and is readily compensated for by damages. And in WILLISTON ON CONTRACTS, sec. 805, it is said: "In many jurisdictions it is held that even though an express condition is not complied with, the plaintiff who has substantially performed, may recover the contract price for his performance, less whatever amount may be necessary to compensate the defendant for failure to comply with the condition qualifying his obligation."

See also *Hammaker v. Schleigh,* 157 Md. 652, 147 A. 790 ... [(1929)]. The principle announced by the above authorities could readily be applied in the present case and apparently was applied by the jury in its verdict.

*Id.* at 135–36, 159 A. 265 (emphasis added).

In *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 621, 112 A.2d 901 (1955), the Court of Appeals explained the substantial performance rule in another way, *viz.:*

As stated in *H.J. McGrath Co. v. Wisner,* 189 Md. 260, 267, 55 A.2d 793: "It is a general rule that a party who has deliberately and wilfully breached a contract cannot recover thereunder for part performance. See WILLISTON, CONTRACTS, Rev. Ed., Secs. 1473, 1474, and note 22 Ill. L.R. 315. However, some courts have allowed recovery on the basis of *quantum meruit* or *quasi* contract." The hardship of the rule requiring strict performance when applied to a contractor who, in good faith, has substantially performed compared to the inequitable advantage that it gives to an owner who receives and retains the benefit of the contractor's labor and material, has led to a qualification that the contract price, less allowance to the owner for deviations, may be recovered. The question of whether there has been substantial compliance and whether a deviation from contract requirements is wilful or justified, is ordinarily a

question for the trier of the facts. *Speed v. Bailey,* 153 Md. 655, 139 A. 534 [(1927)]; *Helmer v. Geis,* 149 Md. 86, 131 A. 34 [(1925)]. In *Speed v. Bailey,* the Court adopted this statement of the rule: " *'When a covenant goes only to a part of the consideration of a contract, is incidental and subordinate to its main purpose, and its breach may be compensated in damages, such a breach does not warrant a rescission of the contract * * *'* By this rule, compensation in damages for slight breaches is substituted for the remedy afforded by a rescission of the whole contract."

(Emphasis added.)

The doctrine of substantial performance did not provide a sound basis for granting an injunction against the appellants. As the trial court found when it granted judgment in favor of appellants at the conclusion of the first phase of the trial, the construction of the garage and gates without MHT's prior approval substantially altered the scope and intent of the Agreement. As mentioned earlier, construction work by the Mullens at Knock's Folly was to conform with the Secretary of the Department of Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings. A copy of those standards was attached and incorporated into the agreement by reference. The trial court's finding that the garage and gates did not conform to the Secretary's Standards is not challenged by the Mullens, nor is the court's finding that the MHT had an objective basis for withholding approval.

It is, of course, true that the Mullens fulfilled the part of the Agreement that called for them to expend their labor and effort to restore the historic home. Restoration of the home was one of the main objectives of the Agreement. But a reading of the Agreement in its entirety makes it clear that another major objective of the Agreement was to ensure that all construction on the property was to conform to the Secretary of the Interior's standards. This was the obvious purpose of including in the Agreement a provision that required the Mullens not to build any structure on the property without preapproval by DNR and the MHT. In view of the above, the

Mullens can scarcely be said to have substantially performed their obligation under the contract.

█ Appellants also contend that the trial judge's grant of an injunction was justified under the doctrine of unjust enrichment.

In *Mass Transit Admin. v. Granite Constr.*, 57 Md.App. 766, 773–74, 471 A.2d 1121 (1984), Judge Bloom, for this Court, said:

> The doctrine of unjust enrichment applies where " 'the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money.' " Dobbs, HANDBOOK ON THE LAW OF REMEDIES § 4.2 (1973), quoting Lord Mansfield in *Moses v. MacFerlan*, 2 Burr. 1005, 97 Eng. Rep. 676 (K.B. 1760). This policy against unjust enrichment is the theory behind the restitutionary remedies. Those remedies serve to "deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses." Dobbs, *supra*, § 4.1. This [C]ourt has previously set out the three elements that must be established in order to sustain a claim based on unjust enrichment.
>
> 1. A benefit conferred upon the defendant by the plaintiff;
>
> 2. An appreciation or knowledge by the defendant of the benefit; and
>
> 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value [Footnote omitted].
>
> *Everhart v. Miles*, 47 Md.App. 131, 422 A.2d 28 ... (1980).

First, the doctrine of unjust enrichment does not apply as against appellants, who are the agencies of the State of Maryland. *Id.* at 780–81, 471 A.2d 1121. Second, the subject case does not involve a claim for the return of money. In-

stead, it involves a suit seeking injunctive and declaratory relief in order to prohibit two State agencies from enforcing their rights under a contract. Third, even if this were a suit for the return of money, under the circumstances of this case, it clearly was not inequitable for the appellants to seek enforcement of their contractual rights.

For the reasons stated above, the order granting the injunction in favor of the Mullens against appellants shall be reversed. Appellants have the right to enforce the forfeiture clause in the Agreement if the Mullens refuse to remove the garage and gates.[13]

## IV.

In their cross-appeal, the Mullens assert that the trial court "erred as a matter of law when it concluded that the State of Maryland–MHT's easement in Knock's Folly is valid as a condition of a gift." They contend that the easement, although valid at the time it was granted in 1980, was extinguished in 1990 when the State of Maryland to the use of DNR obtained title to the property. The Mullens rely on the legal principle that, "when the ownership of the dominant and servient estates become united in one party, an easement is extinguished by merger" (citing, *inter alia, Orfanos Contractors, Inc. v. Louis M. Schaefer, et al.,* 85 Md.App. 123, 132–33, 582 A.2d 547 (1990)). The Mullens point out, correctly, that the grantee of the easement, MHT, is an agency of the State and, since 1990, so is the successor to the grantor of the easement, i.e., the DNR.

The appellants make two arguments in opposition to the Mullens' contention that the easement was extinguished by merger. First, they strenuously contend that the validity of

---

13. A considerable portion of the Mullens' brief focuses on how unfair it would be to allow the State to cancel their life tenancy after they have expended so much sweat and money rehabilitating the house. The appellants, on the other hand, stress that they want the garage and gates torn down and intend to use the forfeiture provision only if the Mullens refuse to do so.

the easement as an encumbrance on the land is irrelevant because, even if the easement is not a valid encumbrance, the Mullens were still obligated "to obtain MHT['s] and DNR's approval[s] for the construction of the garage and the gates by operation of the Curatorship Agreement itself."

In the alternative, appellants contend, albeit with little brio, that unity of title does not exist because, as originally conveyed, the MHT easement "was held by MHT acting within its federal capacity pursuant to federal and state laws governing federal grants authorized by the National Historic Preservation Act of 1966." We need not decide appellants' alternative argument because we agree with their first point.

In granting appellants' joint motion for summary judgment, the trial court declared the rights of the appellants under the easement in almost exact conformity with DNR's request for relief in its counter-complaint for declaratory judgment. In their initial brief in support of their cross-appeal, the Mullens take issue with only the first of five of the court's declarations, i.e., that the deed of easement held by MHT "is a valid legal restriction as a condition of the gift of Knock's Folly from the Kent County Commissioners to DNR." But, the brief overlooks the fact that the court made four other declarations that the Mullens never challenged in their opening brief.[14] Among other things, the court declared that

---

14. Some of the four declarations that went unchallenged in the Mullens' opening brief were challenged in their reply brief. But, as shown by *Oak Crest Vill. v. Murphy,* 379 Md. 229, 841 A.2d 816 (2004), the challenge came too late.

[I]t [is] [im]permissible to present that argument in a reply brief. In *Federal Land Bank v. Esham,* 43 Md.App. 446, 459, 406 A.2d 928, 936 (1979), the Court of Special Appeals correctly noted that, although reply briefs are permitted under the Rules of appellate procedure, their function is limited to responding to points and issues raised in the appellee's brief. An appellant is required to articulate and adequately argue all issues the appellant desires the appellate court to consider in the appellant's initial brief. It is impermissible to hold back the main force of an argument to a reply brief and thereby diminish the opportunity of the appellee to respond to it. We have echoed similar sentiments. *See Fearnow v. C & P Telephone,* 342 Md.

by "executing the Curatorship Agreement, [the Mullens] waived their right to challenge the validity of the" easement and also waived "their right to challenge their acknowledgment that all restoration work at Knock's Folly is subject to approval by MHT"; that Knock's Folly is subject to the terms of the easement under the Agreement with DNR and the Mullens "were and are required to obtain the approval of MHT for all restoration work on Knock's Folly" under the Agreement with DNR.

In light of the fact that the Mullens did not challenge the aforementioned declarations, it is obvious that whether the easement is "a valid legal restriction as a condition of the gift of Knock's Folly from the Kent County Commissioners to DNR" is irrelevant because (according to the court's other unchallenged declaration) the Mullens agreed to be bound by it.

Aside from the fact that the Mullens did not challenge the aforementioned four declarations, we agree with the trial judge and with the appellants that by the expressed language used in the Agreement the Mullens acknowledged that the premises were subject to the easement and that "all restoration work they perform on the premises is subject to approval by" MHT.

## V.

 In their cross-appeal, the Mullens also contend that the trial court erred when it dismissed Governor Glendening as a party defendant. The Mullens contend that, prior to the institution by them of the subject law suit, there were conflicts between DNR and MHT concerning the work performed at Knock's Folly. According to the Mullens, the department heads of DNR and MHT did nothing to resolve the conflicts.

363, 384, 676 A.2d 65, 75 (1996); *Warsame v. State*, 338 Md. 513, 517 n. 4, 659 A.2d 1271, 1273 n. 4 (1995).
379 Md. at 241–42, 841 A.2d 816.

For the proposition that the trial court erred in dismissing Governor Glendening as a party defendant, cross-appellants rely on Section 8–301 of the State Government Article of the Annotated Code of Maryland (2004 Repl. Vol.), which deals with the responsibilities of the governor. Specifically, the Mullens refer us to Section 8–301(c), which provides:

*Task forces.*—(1) Notwithstanding any other law that relates to organization of the Executive Branch of the State government, if a program involves more than 1 principal department and cannot be carried out efficiently through cooperation of the departments, *the Governor may establish a task force to integrate the services of the departments so as to carry out the program.*

(2) A task force established under this subsection may exist for not more than 1 year unless the Governor expressly extends the existence of the task force.

(Emphasis added.)

The cross-appellants make the following argument:

[T]he trial [c]ourt erred when it dismissed the Governor from this action with prejudice. We urge this Honorable Court to reverse and remand, or in the alternative, to [o]rder the Governor of the State of Maryland to establish a task force to integrate the services of the Maryland DNR, DHCD[,] and MHT in the State's implementation of the Resident Curatorship Program.

There are two dispositive answers to the foregoing argument. First, in the complaint and in the motion for declaratory judgment, which names Governor Glendening as a defendant, there was no request that the Governor be ordered to establish a task force. Therefore, it would be error for us to either reverse or remand or order the Governor to take the suggested action. Second, even if the Mullens had made such a request, no common law precept, statute, constitutional provision, or other authority would allow this or any other court to order the Governor to establish a task force. By its plain language Section 8–301 does not require the Governor to establish a task force under any circumstances; it merely

permits him to do so. The trial court did not err in dismissing Governor Glendening as a defendant.

## VI.

In their cross-appeal, the Mullens also contend that the trial judge erred in failing to strike the joint motion for summary judgment filed by the appellants because the joint motion was "filed later than 18 days after service of the [p]laintiffs' motion for summary judgment." This argument is frivolous. Neither Maryland Rule 2–311(b) nor any other Maryland rule restricts the time in which a party or parties may file a motion for summary judgment to eighteen days after a party opponent files a motion for summary judgment.

The Mullens also argue that the trial judge should have struck the appellants' opposition to the Mullens' motion for summary judgment because the opposition was filed later than eighteen days after service of plaintiffs' summary judg-· ment motion.

Appellants filed their opposition to the Mullens' motion for summary judgment three days after the expiration of the eighteen-day time period set forth in Rule 2–311(b). According to the Mullens, because the Maryland Rules are "precise rubrics," the trial judge should have stricken the appellants' summary judgment opposition on the ground of untimeliness.

The Mullens' motion to strike was filed pursuant to Maryland Rule 2–322(e). Under that rule, the moving party has the burden of proving prejudice occasioned by the tardy filing by an opponent. *See Garrett v. State*, 124 Md.App. 23, 28–31, 720 A.2d 1193 (1998).

The Mullens' motion for summary judgment was filed on August 30, 2002; appellants' opposition to that motion was filed on September 19, 2002. The Mullens filed, on October 21, 2002, a reply to appellants' opposition to the motion for summary judgment. Shortly thereafter, on October 23, 2002, the court granted appellants' joint motion for summary judgment and denied the summary judgment motion filed by the

Mullens. As can be seen, the Mullens filed their response to the appellants' opposition to their (the Mullens) summary judgment motion thirty-one days after the appellants' opposition was filed. In their motion to strike, the Mullens do not attempt to show that they were prejudiced by the late filing; moreover, in their brief, cross-appellants do not claim any prejudice. Because no prejudice was shown, we hold that the trial judge did not err in denying the Mullens' motion to strike appellants' opposition.

**ORDER GRANTING INJUNCTIVE RELIEF TO JON AND SALLY MULLEN REVERSED; ALL OTHER JUDGMENTS AFFIRMED; COSTS TO BE PAID BY JON AND SALLY MULLEN.**